**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR RAVENSWOOD BANK, | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| v. | ) ) | **Case No.** |
| RICHARD THORSEN, ERIC HUBBARD, RONALD FRIEDMAN, RAYMOND PROSSER, KALMAN SHINER, CHARLES ECK, ROGER LURI, and SAM SEGVICH, | ) ) ) ) ) ) | **Jury Trial Demanded** |
| **Defendants.** | ) ) | |

**COMPLAINT**

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for Ravenswood Bank

("FDIC-R"), for its Complaint, states as follows:

**I.      INTRODUCTION**

1.      The FDIC-R brings this lawsuit in its capacity as Receiver for Ravenswood Bank,

Chicago, Illinois ("Ravenswood" or the "Bank"), under 12 U.S.C. §1821. The FDIC-R seeks to

recover over $9.14 million in damages caused by Defendants' gross negligence and breaches of

fiduciary duties in violating the Bank's policies and prudent, safe, and sound banking practices.

For Defendants Richard Thorsen and Eric Hubbard, who were both Bank directors and officers,

and Defendant Ronald Friedman, who was a Bank officer, the FDIC-R also seeks to recover

damages caused by their negligence. For those three Defendants, the FDIC-R pleads its breach of

fiduciary duty count in the alternative to its negligence count.

1

2.      The facts alleged in this Complaint show an extreme departure from the standard of care by the eight Defendants in recommending and approving eight loans from November 22, 2005 to December 9, 2008 (the "Loan Transactions").  Defendants recommended and approved two of the Loan Transactions to the same borrower within a five-month period, resulting in damages exceeding *92 percent* of the $6 million principal amount, even though: the loans were considered "essentially unsecured;" the loans were for a Chicago real estate brokerage with *negative* tangible net worth and no earnings history showing an ability to repay; the loan proceeds were for a brokerage owner rather than the brokerage liable for the debt; there was no reasonable alternative source for loan repayment; and for the second loan, for $4 million, the brokerage was facing potentially serious and imminent adverse market conditions.  Defendants similarly recommended and approved the other six loans—for Chicago condominium projects and resulting in over $3.5 million in damages—even though the loans were excessively risky and speculative given the market conditions, projects and developers, and the guarantors and "collateral" provided no reasonable alternative source of repayment if the projects failed.  Defendants in recommending and approving all eight Loan Transactions devoted excessively large amounts of Bank capital to related borrowers and to the Chicago real-estate sector and otherwise disregarded numerous rules for making safe, sound, and prudent loans including many of their own rules as memorialized in the Board-approved loan policy.

3.      Defendants' wrongful acts and omissions occurred, moreover, *after* the Federal Deposit Insurance Corporation ("FDIC") and Illinois Department of Financial and Professional Regulation ("IDFPR") criticized Defendants' lending policies and practices, warned Defendants that their lending practices were risky, including repeatedly about risky concentrations in commercial real estate loans, and threatened specific enforcement action in an effort to put the

Bank on a safe and sound footing. They also occurred *after* others, including the Bank's compliance officer and outside auditor, warned Defendants of risky lending practices such as the Bank's excessive exposure to risks from a down turn in the Chicago real estate market and, for many of the Loan Transactions, after numerous warnings of a "bubble" in the real estate market.

4.      Defendants could not have recommended or approved any of the eight Loan Transactions reasonably believing the Bank would be repaid and, thus, should never have recommended or approved any of those transactions. Their gross disregard of prudent lending practices in those transactions, including their own loan policy rules for making safe, sound, and prudent loans, caused damages exceeding $9.14 million. The FDIC-R in this lawsuit does not seek to collect upon outstanding loans, but rather seeks to collect damages flowing from Defendants' gross negligence, negligence, and breaches of fiduciary duties.

## II.      THE PARTIES

### A.  PLAINTIFF

5.      The FDIC is a corporation organized and existing under the laws of the United States of America, specifically 12 U.S.C. § 1811 *et seq.*, and is an instrumentality of the United States of America charged with, among other duties, the orderly liquidation of failed banks under 12 U.S.C. § 1821(d).

6.      On August 6, 2010, the IDFPR closed Ravenswood and appointed the FDIC as receiver for Ravenswood under 12 U.S.C. § 1821(c). Under 12 U.S.C. § 1821(c) and § 1821(d)(2)(A)(i), the FDIC-R succeeded to the rights, titles, powers, and privileges of the Bank and its depositors, accountholders, other creditors, and stockholders.

## B.  DEFENDANTS

### *Director and Officer Defendants*

7.      Defendant Richard Thorsen was Chief Executive Officer, a director, and a member of the Loan Committee and then Executive Loan Committee of Ravenswood from August 19, 1996 until the Bank failed.  He also was President of Ravenswood from August 19, 1996 until August 23, 2005, when he became Chairman of Ravenswood's Board of Directors, and he remained Chairman until the Bank failed.  Thorsen also was a member of the Board of Directors of CBR Holdings, Inc., Ravenswood's holding company, and owned or controlled 257,755 shares, representing about 22.25 percent of its stock.  Thorsen resides in Winnetka, Illinois.

8.      Defendant Eric Hubbard was Senior Vice President and Senior Lending Officer of Ravenswood from August 19, 1996 until September 23, 1998, and Executive Vice President and Senior Lending Officer of Ravenswood from March 1999 until August 23, 2005, when he became President of Ravenswood and remained so until the Bank failed. He was a member of the Loan Committee and then Executive Loan Committee of Ravenswood from August 19, 1996 until the Bank failed, and a member of the Board of Directors of Ravenswood from September 23, 1998 until the Bank failed.  He also owned or controlled 68,000 shares, representing about 5.87 percent of CBR Holdings stock.  Hubbard resides in Glenview, Illinois.

### *Director Defendants*

9.      Defendant Raymond Prosser, an attorney, was a member of Board of Directors and Loan Committee and then Executive Loan Committee of Ravenswood from August 19, 2006

until the Bank failed.  He also owned or controlled 56,710 shares, representing about 4.89 percent of CBR Holdings stock.  Prosser resides in Chicago, Illinois.

10.     Defendant Kalman Shiner, a certified public accountant, was a member of Board of Directors and Loan Committee and then Executive Loan Committee of Ravenswood from August 19, 2006 until the Bank failed.  He also owned or controlled 25,046 shares, representing about 2.2 percent of CBR Holdings stock.  Shiner resides in Chicago, Illinois.

11.     Defendant Roger Luri was a member of the Board of Directors and Executive Loan Committee of Ravenswood from August 23, 2005 until the Bank failed.  Luri resides in Chicago, Illinois.

12.     Defendant Charles Eck was a member of the Board of Directors of Ravenswood from August 23, 2005 until the Bank failed, and a member of the Executive Loan Committee from August 23, 2005 until August 1, 2006, and then again from September 29, 2009 until the Bank failed. Eck also owned or controlled 4800 shares, representing less than one-half percent of CBR Holdings stock.  Eck resides in La Grange, Illinois.

13.     Defendant Samuel Segvich was a member of the Board of Directors and Executive Loan Committee of Ravenswood from August 23, 2005 until the Bank failed.  Segvich resides in Glencoe, Illinois.

### Officer Defendant

14.     Defendant Ronald Friedman was a Senior Vice President in lending for Ravenswood from April 1, 2002 until September 19, 2006, and an Executive Vice President in lending for Ravenswood from September 19, 2006 until the Bank failed.  Friedman resides in Buffalo Grove, Illinois.

### III.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action because actions in which the FDIC is a party are deemed to arise under federal law according to 12 U.S.C. § 1811, et seq., 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345.

16.     This Court has personal jurisdiction over Defendants under 735 ILCS § 5/2-209, *et seq.* because, among other things, the FDIC-R's claims arise from Defendants transacting business, committing tortious acts, and breaching fiduciary duties in Illinois.

17.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because one or more of the Defendants reside in this district and a substantial part of the events or omissions giving rise to the FDIC-R's claims occurred in this district.

### IV.     BACKGROUND

#### A.     HISTORY OF THE BANK

18.     Ravenswood was a state non-member bank regulated by the FDIC and IDFPR. The Bank's deposits were insured by the FDIC, and its original charter dates to August 19, 1996. It was a wholly-owned subsidiary of CBR Holdings, had a home office in the "Ravenswood" neighborhood of Chicago, Illinois, and eventually opened one branch office, in Mt. Prospect, Illinois.

19.     Defendants Thorsen and Hubbard managed the Bank from its opening in August 1996, focusing on high-risk commercial real estate lending to increase the Bank's assets.  In just 10 years, through 2006, the Bank's Board of Directors and executive management grew the Bank's total assets from $17 million to over $300 million, while ignoring repeated warnings by Bank examiners that the Bank was investing too heavily in speculative commercial real estate loans. Despite those and other warnings, the Board of Directors and management failed to take

appropriate corrective action, repeatedly violated their own rules for prudent lending as memorialized in the Board-approved loan policy, and failed to follow prudent, safe, and sound banking practices.

## B. DEFENDANTS' FAILURE TO HEED REPEATED REGULATORY, INTERNAL, AND AUDITOR WARNINGS

20.     The CAMELS rating is a supervisory rating system for classifying a bank's overall condition.  By April 26, 2004, in their Joint Report of Examination as of September 30, 2003, the FDIC and IDPFR had downgraded the Bank's CAMELS composite rating to a "less than satisfactory" 3 for the *fourth time* since the Bank's August 1996 opening.  As they had done through multiple past reports of examination, examiners also warned the Bank's Board of Directors and management about relying on speculative construction lending and credit concentrations in commercial real estate loans.  According to the Joint Report: "Asset quality remains a concern due to the increase of adversely classified credit, the expansion of real estate concentrations, and loan administration concerns;" credit concentrations "remain significant, are increasing, and have exceeded Loan Policy limitations;" and "[c]loser supervision of Board imposed concentration limits is necessary" as some real estate loan policy "limits have been surpassed."

21.     On or about April 26, 2004, the FDIC also sent the Bank's Board of Directors a proposed Memorandum of Understanding ("proposed MOU") directing the Board and management to conduct a risk analysis for re-evaluating loan policy concentration limits for commercial real estate loans, to require complete loan documentation, realistic loan repayment terms, and current borrower financial information adequate to support the credit being extended, and to incorporate those requirements into the Bank's loan policy.  To obtain consent to the

corrective action required by the proposed MOU, the FDIC agreed to accept a resolution adopted

by the Board on May 18, 2004, effectively assuming obligations under the proposed MOU.

22.     Defendant Hubbard acknowledged in a May 18, 2004 memorandum to the Board

about loan policy concentration limits that the "bank continues to generate a substantial amount

of construction loans," noting that the Board "acknowledges that this is a concentration and that

Construction Loans are inherently more risky than a standard real estate loan."

23.     Although the Bank's loan policy was amended in August 2004 to include the

requirements of the May 18, 2004 resolution, the Board of Directors and management continued

to approve and recommend high-risk loans to borrowers for commercial real estate and other

purposes, without realistic loan repayment terms and without current borrower financial

information adequate to support the loans.

24.     By April 12, 2005, in their Joint Report of Examination as of September 30, 2004,

the FDIC and IDPFR warned the Bank's Board of Directors and management of their failure to

fully comply with the Board's May 2004 resolution concerning commercial real estate loan

concentration risks, and that the Bank's loan portfolio "continues to be heavily concentrated in

commercial real estate credits, including a significant volume of construction and land

development credits."  The Joint Report also warned of loan underwriting and administration

deficiencies.

25.     On January 13, 2006, the FDIC and other regulators issued proposed Interagency

Guidance on Concentrations in Commercial Real Estate Lending, Sound Management Practices,

71 FR 2302 (January 13, 2006) ("Proposed Guidance").  The Proposed Guidance required

"heightened risk management practices" when an institution's loans exceeded thresholds for

commercial real estate loan concentrations.  More specifically, the Proposed Guidance required

"heightened" practices when loans for construction, land development, and other land were 100

percent or more of total capital. As of December 31, 2005, Ravenswood's reported loans for

construction, land development and other land totaled nearly $64.5 million or about *244 percent*

of its reported total capital of about $26.445 million—well over the threshold for "heightened

risk management."

26.     The Proposed Guidance also required those "heightened" practices when loans for

commercial real estate were 300 percent or more of total capital. As of December 31, 2005,

Ravenswood's reported commercial real estate loans totaled over $166 million or nearly *629*

*percent* of its reported total capital of about $26.445 million—once again, well over the threshold

for "heightened risk management."

27.     Ravenswood's compliance officer, Roland Dehne, generally advised the Board

and management about the Proposed Guidance at least as early as the January 24, 2006 Board of

Directors meeting.

28.     About two-weeks later, by memorandum to the Loan Officers Credit Committee

dated February 8, 2006, committee member, Rich Adamson, warned other committee members,

including Defendants Hubbard and Friedman, of analyst-commentary suggesting a real estate

"Bubble."

29.     Then less than two weeks thereafter, by letter dated February 21, 2006 to

Defendants Luri, Prosser, Segvich, and Shiner for the February 21, 2006 Board of Directors

meeting, Defendant Hubbard acknowledged a "heavy concentration in construction and

commercial real estate loans" and that it "will take several years to diversify the loan portfolio."

Hubbard in that letter also warned that the directors would "need to acknowledge that the Bank

exceeded the Board Approved Concentration Guidelines" relating to certain types of commercial real estate loans.

30.     On the same day as Hubbard's February 21, 2006 letter, FDIC examiners attending the Bank's Board of Directors meeting presented findings from the FDIC's Report of Examination as of September 30, 2005, which warned the Board and management of stale financial information, insufficient debt service calculations, the absence of commercial real estate loan-portfolio stress tests, and a "significant concentration in commercial real estate, including construction lending." During the Board meeting, the FDIC examiners also warned the Board and management that a major area of concern was the Bank's commercial real estate loan concentrations. Those examiners also referenced the Proposed Guidance concerning commercial real estate loan concentrations.

31.     About a month after the February 2006 Board meeting, in their March 24, 2006 audit report for the year-end 2005, the Bank's outside auditor, McGladrey, warned the Board of Directors and management of a "concentration of credit risk" due to "loans secured by real estate"—echoing the examiner's concerns.

32.     Shortly thereafter, by an April 2006 letter to Defendants Luri, Prosser, Segvich, and Shiner for the April 25, 2006 Board of Directors meeting, Defendant Hubbard *again* acknowledged a "heavy concentration in construction and commercial real estate loans" and that it "will take several years to diversify the loan portfolio." Hubbard in that letter also *again* warned that the directors would "need to acknowledge that the Bank exceeded the Board Approved Concentration Guidelines" relating to certain types of commercial real estate loans.

33.     Defendant Hubbard with that April 2006 letter also forwarded a Board Package for the April 25, 2006 Board meeting, including an analysis of the Bank's allowance for loans and lease losses.  The analysis included the following remarks, among others:

> The media continue to report on the expectation of a bubble in real estate prices, although, the Chicago market generally is not included in these remarks. The phenomenon is so widely reported that it could become a self-fulfilling prophecy. The portfolios most at risk are the Construction Portfolio . . . and to a lesser extent the Multifamily and Real Estate Portfolios . . . .

34.     Shortly thereafter, by May 10, 2006 letter to Defendants Luri, Prosser, Segvich, and Shiner for the May 16, 2006 Board of Directors meeting, Defendant Hubbard *again* acknowledged a "heavy concentration in construction and commercial real estate loans" and that it "will take several years to diversify the loan portfolio."  Hubbard in that letter also *again* warned that the directors would "need to acknowledge that the Bank exceeded the Board Approved Concentration Guidelines" relating to certain types of commercial real estate loans. Then during the May 16, 2006 Board of Directors meeting Board members acknowledged a "real estate slow down."

35.     About a month thereafter, in a June 14, 2006 letter to Defendants Eck, Shiner, Segvich, and Luri for the June Board of Directors meeting, Defendant Hubbard once *again* acknowledged a "heavy concentration in construction and commercial real estate loans" and that it "will take several years to diversify the loan portfolio."  Hubbard also warned of total speculative housing construction loans exceeding Board-concentration guidelines by over 30 percent.  The Board also knew by the June 20, 2006 Board Meeting that the Bank's speculative

condominium conversion loans exceeded Board-approved concentration limits by $15.8 million or about 79%.

36.     About a month later, by July 13, 2006 letter to Defendants Luri, Prosser, Segvich, and Shiner for the July 2006 Board of Directors meeting, Defendant Hubbard *again* acknowledged a "heavy concentration in construction and commercial real estate loans" and that it "will take several years to diversify the loan portfolio." Hubbard in that letter also *again* warned that the directors would "need to acknowledge that the Bank exceeded the Board Approved Concentration Guidelines" relating to certain types of commercial real estate loans.

37.     With that July 13, 2006 letter, Defendant Hubbard also forwarded a Board Package for the July 2006 Board meeting, including an analysis of the Bank's allowance for loans and lease losses or "ALLL."  That July ALLL analysis like the April 2006 ALLL analysis included the following remarks:

> The media continue to report on the expectation of a bubble in real estate prices, although, the Chicago market generally is not included in these remarks. The phenomenon is so widely reported that it could become a self-fulfilling prophecy. The portfolios most at risk are the Construction Portfolio . . . and to a lesser extent the Multifamily and Real Estate Portfolios . . . .

38.     A little over two weeks later, by July 31, 2006 letter to Defendants Luri, Prosser, Segvich, and Shiner for the August 2006 Board of Directors meeting, Defendant Hubbard *again* acknowledged a "heavy concentration in construction and commercial real estate loans" and that it "will take several years to diversify the loan portfolio."  Hubbard in that letter also *again* warned that the directors would "need to acknowledge that the Bank exceeded the Board Approved Concentration Guidelines" relating to certain types of commercial real estate loans.

39.     Then on or about September 5, 2006, the Bank's compliance officer, Roland Dehne, warned by memorandum to Defendants Thorsen and Hubbard and the Bank's audit committee Chairman, Defendant Shiner (the "Warning Memorandum"), of continued "sizeable" loans to developers "who do not appear to have sufficient other assets and/or income to provide additional protection for the bank in case the project is delayed or sales do not develop as projected," that all segments of the Bank's real estate market "have, or are expected to, slow down," and of the need to closely manage the Bank's large concentration in condominium construction loans and to monitor the progress of borrowers involved with more than one construction project.

40.     Thirteen days later, in a September 19, 2006 letter to Defendants Eck, Shiner, Segvich, and Luri, Defendant Hubbard *again* acknowledged a "heavy concentration in construction and commercial real estate loans" and that it "will take several years to diversify the loan portfolio." He also acknowledged that speculative construction loans exceed Board-approved concentration guidelines by nearly 30 percent. Hubbard's letter also forwarded the Board Package for the September 2006 Board meeting, including Dehne's September 5, 2006 Warning Memorandum. The full Bank Board thus had knowledge of Dehne's September 5, 2006 warnings.

41.     Less than a month later, in an October 11, 2006 letter to Defendants Eck, Shiner, Segvich, and Luri, and new Bank director, Director T, Defendant Hubbard acknowledged "high" credit concentrations, that management was "still concerned about a slow down in the economy" and that "[n]egative media articles continue to play havoc with the real estate market and may trigger a self-fulfilling prophecy of a real estate bubble." Defendant Hubbard with that October 11, 2006 letter also forwarded a Board Package for the October 2006 Board meeting, including

an analysis of the Bank's allowance for loans and lease losses. That ALLL analysis like the April

2006 ALLL analysis and July 2006 ALLL analysis included remarks about the real estate

"bubble," warned that "the bank has a concentration in construction lending that is increasing

compared to 6/30/05," and warned that the "Construction Portfolio" and, to a "lesser extent,"

"Multifamily and Commercial Real Estate Loan Portfolio" were "most at risk."

42.     Two months later, on December 12, 2006, the FDIC, Federal Reserve, and Office

of Comptroller of Currency jointly issued FIL-104-2006, *Guidance on Concentrations in*

*Commercial Real Estate Lending, Sound Risk Management Practices*, 71 Fed. Reg. at 74581,

74585 (Dec. 12, 2006) ("Final Joint Guidance").  The Final Joint Guidance warned the Board of

Directors and management, and bankers generally of, among other things, risks posed by

commercial real estate or "CRE" loan concentrations, that "concentrations in CRE lending

coupled with weak underwriting and depressed CRE markets have contributed to significant

credit losses in the past," that concentrations in CRE loans "may make . . . institutions more

vulnerable to cyclical CRE markets," and that "[c]oncentrations of credit exposures add a

dimension of risk that compounds the risk inherent in individual loans."

43.     The Final Joint Guidance included numeric indicators for concentration risk

including for loans for construction, land development, and other land—namely, 100 percent or

more of total capital—and for commercial real estate loans—namely, 300 percent or more of

total capital, with an increase in outstanding balances of the institution's commercial real estate

portfolio of 50 percent or more during the prior 36 months.

44.     As of December 31, 2006, Ravenswood's reported loans for construction, land

development, and other land totaled nearly $97 million or nearly *313 percent* of its reported total

capital of about $31.029 million—well over the concentration risk threshold and much worse

than it reported only one year earlier. And as of December 31, 2006, Ravenswood's reported commercial real estate loans totaled over $199 million or over *641 percent* of its reported total capital of about $31.029 million—once again, well over the concentration risk threshold and, once again, worse than reported one year earlier. Those over $199 million in reported commercial real estate loans, moreover, represented an increase of over $73 million or about 57.8 percent from the total of over $126 million in commercial real estate loans reported as of December 31, 2003—again exceeding the concentration risk threshold.

45.      On or about January 2, 2007, compliance officer, Dehne, *once again* warned by memorandum to Defendants Thorsen and Hubbard, and the Bank's audit committee Chairman, Defendant Shiner (the "Warning Memorandum"), of continued "sizeable" loans to developers "who do not appear to have sufficient other assets and/or income to provide additional protection for the bank in case the project is delayed or sales do not develop as projected," that all segments of the Bank's real estate market "have, or are expected to, slow down," and of the need to closely manage the Bank's large concentration in condominium construction loans and to monitor the progress of borrowers involved with more than one construction project.

46.      Less than a month later, in a January 23, 2007 letter to Defendants Eck, Shiner, Segvich, and Luri, Defendant Hubbard *once again* acknowledged "high" credit concentrations, that management was "concerned about a slow down in the economy" and that "[n]egative media articles continue to play havoc with the real estate market and may trigger a self-fulfilling prophecy of a real estate bubble." Hubbard's letter forwarded the Board Package for the January 2007 Board meeting, including Dehne's January 2, 2007 Warning Memorandum and also the results of a "stress test" on the Bank's loan portfolio. The full Bank Board thus had knowledge of Dehne's January 2, 2007 warnings. And the full Board also knew from the "stress test" results

in the Board Package that a "correction" in real estate prices "in the 15% to 20% range would not be unexpected," that certain ongoing real estate market practices would "result in lower profit margins for builders and increased risk for the bank," that the "real estate market is cooling and this slowdown will negatively impact the bank's earnings," and that the Bank "likely" will "incur some losses over the next few years" as a result.

47.     About three months later, in their April 17, 2007 audit report for the year-end 2006, the Bank's outside auditor, McGladrey, *once again* warned the Board of Directors and management of a "concentration of credit risk" due to "loans secured by real estate."

48.     By August 6, 2007, in its Report of Examination as of March 31, 2007, the IDPFR warned the Board of Directors and management of a "concentration by a relationship," inadequate cash flow analysis for large borrower relationships, continued "significant concentrations in commercial real estate and construction loans," and Board and management reliance on stale financial information for credit decisions. The IDPFR also directed the Board of Directors and management to enhance procedures for identifying and monitoring high-risk borrowers.

49.     Despite repeated warnings by Bank regulators and others, such as the Bank's compliance officer and outside auditor, about the risks involved, the Board of Directors and management grew the Bank's commercial real estate loans from over $126 million as of December 31, 2003 to nearly $231 million at the peak by March 30, 2008, which was about a $105 million increase or *over 83 percent*. In that same timeframe of just over four years, they grew the Bank's loans for construction, land development, and other land from about $34.814 million to over $104 million, which was over $69 million or nearly *triple* the size.

50.     Compared to its bank peer group, Ravenswood for year-ends from 2004 to 2007 was in the 93rd to 94th percentiles for total capital concentrated in commercial real estate loans; the 96th to 98th percentiles for multifamily loans, including condominiums; and the 87th to 98th percentiles for construction and development loans.  From January 13, 2006, when the FDIC and other regulators issued their Proposed Guidance concerning commercial real estate loan concentrations, until the Bank failed, the Bank's loans for construction, land development and other land and for commercial real estate always exceeded the Proposed Guidance and Final Joint Guidance capital-percentage thresholds for heightened scrutiny for those loans.

51.     By year-end 2008, the Bank's commercial real estate loans represented over 983 percent of the Bank's total capital, including over 453 percent for construction, land development, and other land loans. Compared to its peer group, Ravenswood was in the 99th percentile for total capital concentrated in commercial real estate loans.

52.     From 2006 through 2009, just after its commercial real estate loan totals peaked, the Bank's adversely classified assets increased *about 408 percent*.  And beginning in 2008, just before commercial real estate loan totals peaked, the Bank's liquidity eroded because of past-due and nonaccrual commercial real estate loans.

53.     By March 10, 2009, in a Report of Examination as of December 31, 2008, the FDIC downgraded the Bank to a composite CAMELS 4 "unsatisfactory" rating. Then on July 6, 2009, the FDIC issued a Cease and Desist Order directing the Board of Directors and management to correct certain unsafe and unsound banking practices including improper or deficient lending practices, loan underwriting, and loan review, and excessive credit concentrations.

54.     But the Board of Directors and management failed to comply with that Cease and Desist Order.  Commercial real estate loans by year-end 2009 represented 1229 percent of the Bank's total capital.  By July 21, 2010, in their Joint Report of Examination as of December 31, 2009, the FDIC and IDPFR further downgraded the Bank to a composite CAMELS 5 rating, noting the Bank's "weak condition" and that its "future viability is in doubt."   The Bank failed just over two weeks later, on August 6, 2010.

## C.     RAVENSWOOD'S LOAN POLICY

55.     Ravenswood's loan policy established rules governing, and responsibilities of, the directors and officers for making safe, sound, and prudent loans to borrowers.  Ravenswood's loan policy was amended in 2004 to comply with the May 2004 Board of Directors resolution, which assumed  obligations under the FDIC's April 2004 proposed MOU, and then amended periodically thereafter through 2009 (the "Loan Policy").  In making credit decisions for commercial loans and for commercial real estate loans, including for the eight Loan Transactions, the Loan Policy required that directors and officers consider:

   a.   A $3 million aggregate in-house lending limit for related borrowings;

   b.   "[C]urrent" financial information "adequate to support" the debt including "at a minimum, detailed balance sheets, profit and loss statements, or copies of tax returns and cash flow projections;"

   c.   The "reputation and standing" of the borrowers;

   d.   The "[a]bility and stability" of the borrower's "current management;"

   e.   The stability of the borrower's earnings and whether they show "upward trends;"

    f.   Whether the borrower has "[c]ash flow to support debt service" including a minimum debt service coverage ratio of 1.2 to 1, meaning $1.20 in cash available for every dollar of debt service;

    g.   "Earnings projections based on reasonable assumptions;"

    h.   The "[f]inancial strength" of the business that would be borrowing the funds;

    i.   The "[v]alue and marketability of collateral" for the proposed loan; and

    j.   A written appraisal from a qualified appraiser "with sufficient information and analysis to support the lending decision" and establishing a loan-to-value ratio, before August 2008, of not greater than 80 percent for commercial real estate loans and 75% for land development loans and, thereafter, 70-75% of appraised value upon completion for commercial real estate loans and 60-70% for land development loans.

56.    Under the Loan Policy, "[u]nsecured loans are reserved only for the Bank's most credit-worthy customers" and to "be supported by" a "[w]ritten understanding that the credit is expected to be repaid within a specific time frame, usually up to 365 days . . . ," identified "primary and secondary sources of repayment of sufficient certainty and timing to retire the debt as scheduled," "[c]urrent financial information reflecting favorable net worth to debt relationships with asset values well defined," "[c]urrent financial information that reflects sufficient liquidity in assets to repay debt in a timely manner," and "[v]erified income information, reflecting ample income to service the borrower's liabilities." Under the Loan Policy, an unsecured loan to an un-creditworthy borrower generally should not be justified by adding a creditworthy guarantor. Unsecured loans, in addition, "should be no larger than 10% of the tangible net worth of the borrower."

57.     The Loan Policy also provided that "[c]oncentrations of credit are against the policy of the Bank."  And it defined a "concentration of credit" as "being any loan or group of loans based on Standard Industrial Classification Codes (SIC) and/or Bank established codes that exceed 25% of the Bank's capital and surplus that are to: (1) one individual, (2) a related group of borrowers, (3) one industry, or (4) a similar class of collateral."

## D.     RAVENSWOOD'S LOAN APPROVAL AUTHORITIES

58.     Under the Loan Policy, the recommending loan officer was required to prepare a credit approval report for the approving authority before final loan approval.  The approval report identified loan participant and source and terms of repayment.  It also included a description of and value for any collateral and of any other related debt due to the Bank, including the total exposure to the Bank from debt held by the borrower, guarantors, and any other related debt relationships.

59.     The Executive Loan Committee approved all eight Loan Transactions.  That committee was authorized to approve loans exceeding the authority of the Loan Officer Credit Committee, up to the Bank's legal lending limit.  The Loan Officer Credit Committee had authority to approve loans up to $200,000 for secured loans and $50,000 for unsecured loans until August 23, 2005, and thereafter, up to $750,000 for secured loans and $200,000 for unsecured loans.  Under Illinois law, the Bank's legal lending limit was 25 percent of the Bank's statutory capital base.  Each Defendant served on the Executive Loan Committee at various times.  Loan approvals required a majority vote of Executive Loan Committee members present.  For a quorum of that committee, at least three members were required, one of which was the committee Chairman.

E.    **DEFENDANTS' GROSS NEGLIGENCE, NEGLIGENCE, AND FIDUCIARY BREACHES CONCERNING THE LOAN TRANSACTIONS**

60.    As detailed in this Complaint, from November 22, 2005 to December 9, 2008, Defendants recommended or approved grossly imprudent loans, namely, the eight Loan Transactions, which caused damages to FDIC-R exceeding $9.14 million. Defendants routinely failed to identify reasonably reliable and adequate sources of repayment from the borrowers, routinely ignored and repeatedly failed to follow material Loan Policy requirements, and frequently departed from fundamental safe, sound, and prudent banking practices.

61.    The following table shows the borrowers, initial approval dates, and loan amounts for the Loan Transactions and identifies each Defendant recommending or approving those transactions:

| Borrower | Initial Approval Date | Amount ($ millions) | Approvals | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Eck (d) | Hubbard (o/d) | Luri (d) | Prosser (d) | Segvich (d) | Shiner (d) | Thorsen (o/d) | Friedman (o) |
| 1. United North Shore | Nov. 22, 2005 | $2.000 | | r | x | x | x | a | x | |
| 2. United North Shore | Apr. 4, 2006 | $4.000 | x | r | x | x | x | x | x | |
| 3. Western View II | Apr. 11, 2006 | $2.240 | x | | x | x | x | x | x | r |
| 4. Chicago View II | May 8, 2007 | $3.476 | | | x | x | x | x | x | r |
| 5. Chicago View II | May 8, 2007 | $1.118 | | | x | x | x | x | x | r |
| 6. Chicago View II | May 8, 2007 | $1.127 | | | x | x | x | x | x | r |
| 7. 7255 N. Bell | Jul. 31, 2007 | $1.590 | | rx | x | x | x | x | x | |
| 8. 7255 N. Bell | Dec. 9, 2008 | $0.278 | | rx | x | x | x | x | x | |
| **TOTAL** | | **$15.84** | | | | | | | | |

Key: a = abstained; r = recommended; x = approved; d = director; o = officer

62.    All eight Loan Transactions involved funding either a business or a development project directly impacted by changes in the Chicago-area real estate market.  Recommendations and approval decisions were made as the real estate market continued its precipitous decline, or

at least after warnings of the risks resulting from a decline or that a decline may be imminent. Defendants compounded the risks associated with the eight Loan Transactions by committing excessively large amounts of the Bank's total reported capital to a single borrower or related group of borrowers including amounts well over the Bank's $3 million in-house lending limit.

### *United North Real Estate Brokerage Loans* [1]

63.     Within a five-month period through late April 2006, Defendant Hubbard recommended, and Defendants Luri, Prosser, Segvich, and Thorsen approved, two "essentially unsecured" loans totaling $6 million to United North Shore LLC d/b/a Century 21 Sussex & Reilly or "United North." Defendants Eck and Shiner in April 2006 also approved the second of those two loans, for $4 million. In recommending and approving those two loans, Defendants dedicated nearly *one quarter* of the Bank's total capital to this single borrower and increased the Bank's already-heavy exposure to known risks resulting from a down-turn in the Chicago real estate market.  Defendants, moreover, did so even though *nearly 100 percent* of the $6 million in proceeds went to one of this North-side real estate brokerage's business's owners rather than to the business itself.  And they also did so even though it was readily apparent from the credit approval reports for the loans that there was no reasonable and reliable source of repayment for them and that the loans otherwise violated banking standards for making safe, sound, and prudent loans, including many of Defendants' own rules for prudent lending as stated in the Board-approved Loan Policy.

64.     More specifically, on November 22, 2005, Defendants Luri, Prosser, Segvich, and Thorsen, acting through the Executive Loan Committee and upon the recommendation of

---

[1] The names of guarantors are not included in this Complaint to avoid unnecessary disclosure of personally identifiable information.

Defendant Hubbard, approved a $2 million loan to United North, with a guaranty from Member C and a first lien on United North's "Business Assets" as collateral ("United North Loan #02"). United North was organized as a limited liability company in January 2002 with a main office in the "Roscoe Village" area on Chicago's North side.  Member C was one of United North's two members as of November 22, 2005.  United North's second member, Member S, would not be guaranteeing United North's obligation for United North Loan #02 for $2 million, even though Member S owned a majority United North voting interest.

65.     In approving United North Loan #02, Defendants Luri, Prosser, Segvich, and Thorsen relied on a credit approval report prepared by Defendant Hubbard, stating that the purpose of the loan was to refinance a note that United North's second member, Member S, provided to the estate of a third person to buy-out that estate's interest in United North.  The approval report also stated that Member C had purchased the note from the estate. Nothing in the approval report showed how the loan benefitted the United North business.

66.     Defendant Hubbard's approval report for United North Loan #02 included no cash flow projections for United North, let alone projections based on reasonable assumptions demonstrating its ability to repay the debt.  It showed that United North's income history was short and erratic and that it had over $1 million in *negative* tangible net worth.  It acknowledged that the loan would be "essentially unsecured" and that any collateral would be "illiquid."  It showed the guarantor, Member C, had net worth based largely on self-assigned real estate values from a stale October 2004 financial statement.  And it showed that Member C's ability to service the debt as guarantor was based on erratic income sources such as selling buildings and limited liability company interests.

67.     Ravenswood's total loan commitments to United North, including United North Loan #02 and a working capital line of credit ("United North Loan #01"), would rise to $2.6 million or about 10 percent of the Bank's total reported capital of $26.455 million as of December 31, 2005. As of November 22, 2005, United North Member S also had a personal loan with Ravenswood for up to $250,000.

68.     Despite what the approval report showed about the proposed borrower and guarantor, United North Loan #02 closed in early January 2006 with principal and interest payable over 10 years.  Except for closing costs, all $2 million in loan proceeds went to an account for Member C.  No proceeds went to United North.

69.     On April 4, 2006, only three months after disbursing nearly $2 million to Member C from United North Loan #02, Defendants Luri, Prosser, Segvich, Thorsen, Eck, and Shiner, acting again through the Executive Loan Committee and upon the recommendation of Defendant Hubbard, approved a $4 million loan to United North ("United North Loan #03").  The loan as initially approved would include guaranties from Member S, a proposed new United North member, Member B, three additional proposed members, W, X, Y and Z, and another proposed United North member, Director T.  Director T would become a Ravenswood director less than four months later, on August 1, 2006.  Unlike United North Loan #02, moreover, this loan would be "secured" by a *second*, rather than first lien on United North's business assets, in addition to an assignment of insurance policy proceeds on Member S's life.

70.     The purpose of United North Loan #03, according to a credit approval report by Defendant Hubbard, was to fund a buy-out of Member C for $4 million. Thus, with the nearly $2 million in proceeds from United North Loan #03 approved on November 22, 2005, Defendant

Hubbard and the Executive Loan Committee in less than five months would approve providing Member C nearly $6 million in loan proceeds from Ravenswood.

71.     The term of United North Loan #03 would be seven years, with *interest only* for the first two years and principal and interest the last five years. Approval was conditioned on substantially increasing monthly payments on United North Loan #02 to provide for a quicker pay-off by reducing the term from ten to two years, and on reducing the credit limit on United North Loan #01 from $600,000 to $435,000.

72.     On April 18, 2006, the Executive Loan Committee modified its April 4, 2006 approval of United North Loan #03 by approving removal of proposed member W as a guarantor.  Then on April 25, 2006, the Executive Loan Committee approved removal of proposed members X, Y and Z as guarantors, adding proposed Members B and Director T as guarantors of United North Loan #01 and #02, adding Member S as guarantor of United North Loan #02, and adding an assignment of Century 21 rebate rights as additional "collateral."  W, X, Y, and Z would not become United North members.

73.     The Executive Loan Committee modified its April 4, 2006 approval of United North Loan #3 further by on May 2, 2006 approving a further reduction in the term of United North Loan #02 to 18 months and, for United North Loan #03, issuance of a Standby Letter of Credit for Member C's benefit instead of disbursing cash immediately to Member C.  The Letter of Credit, when drawn on by Member C, would convert to the originally contemplated term loan payable by United North, with only interest due for the first two years and principal and interest due the last five years.

74.     In approving United North Loan #03 on April 4, 2006, and modifying it thereafter on April 25, 2006 and May 2, 2006, the Executive Loan Committee relied on credit approval

25

reports and then a memorandum by Defendant Hubbard.  Defendant Hubbard acknowledged in the approval reports, among other things, that United North Loan  #03 would be "essentially unsecured" and had "weak collateral value," and that the "[g]uarantors cannot afford to service the debt personally."  According to the approval reports, guarantor and soon-to-be-Bank-director, Director T, had a prior bankruptcy.

75.    The approval reports for United North Loan #03 also showed, based on a stale September 2005 financial statement, that United North had *negative* tangible net worth.  United North's already-negative tangible net worth, moreover, was becoming far worse with the over $2 million in Bank debt added in January 2006 and $4 million in Bank debt United North proposed adding—with no corresponding increase in its assets.

76.    Although the approval reports included cash flow projections for United North, had Defendants considered those projections carefully they would have concluded that they could not reasonably rely upon United North's cash flow to repay the debt.  The approval report for the April 25, 2006 Executive Loan Committee meeting also acknowledged that: "The guarantors' combined debt service coverage and debt to income are outside of the Bank's standard due to the large loss reported by [Member S]."

77.    With the proposed $4 million debt, the Bank's total commitments to Ravenswood would exceed $6.407 million, *nearly 24 percent* of the Bank's reported total capital of $27.506 million as of March 31, 2006.  Nearly all of that debt was "essentially unsecured."   The approval reports acknowledged in a loan policy exceptions section that: "The Guarantors outstanding commitments exceed the Bank's in house lending limit."   In fact, the Bank's loans to United North were well *over twice* the amount of the $3 million in-house lending limit.

78.     United North Loan #03 nevertheless closed on May 17, 2006. United North and Members C, S, B, and Director T, as a United North member, also entered into a Reorganization and Subscription Agreement, which included a closing on or about September 20, 2006. Subject to certain conditions, Members S and B, and Director T would acquire 95 percent, and Member C would have 5 percent of United North's membership units.

79.     As a condition for United North Loan #03, the Bank also (a) reduced the term of United North Loan #02 from ten years to 18 months, with monthly payments increasing from $23,323.12 to $114,375.38, and (b) lowered the debt limit on United North Loan #01 from $600,000 to $435,000. But only a month later when the first payment was due for United North Shore Loan #02, United North objected to the increased monthly payments. So on July 11, 2006, the Executive Loan Committee, based upon Hubbard's recommendation, approved reducing monthly payments back to $23,221.70, with additional annual principal reductions depending on Century 21 rebates.

80.     Less than *nine months* after United North Loan #02 closed and less than *four months* after United North Loan #03 closed, Bank compliance officer, Dehne, submitted his September 5, 2006 Warning Memorandum to Defendants Thorsen, Hubbard, and Shiner. That memorandum warned that, among other things:

    a.  "The [United North Loan #02] is secured by the business assets of United North Shore, LLC, which is essentially goodwill that could have limited, if any, collateral value."

    b.  The "respective incomes" of the new guarantors, Director T and Members B and S, "are not steady and cannot be realistically relied upon for debt service in the event of a default or other problem . . . ."

27

    c. "The bank is relying heavily upon the real estate firm being more profitable than it has ever been in the past and sales and income must increase significantly for the projections to be met."

The entire Board received a copy of that memorandum for the September 2006 Board meeting thereafter.

81.    In late September 2006, the closing under the United North Reorganization and Subscription Agreement occurred, changing the membership for United North. Member C drew down $4 million on the Bank's Letter of Credit, and United North became obligated for that amount under the mid-May 2006 Loan and Security Agreement. United North received none of the $4 million in loan proceeds. Nor did it benefit from them in any tangible way. But it did receive the burden of the $4 million debt.

82.    *Less than two months later*, by mid-November 2006, United North could not handle its debt burdens. It was late in paying both United North Loan #02 and #03. Defendant Hubbard reported in a memorandum to the Executive Loan Committee that United North "is experiencing a down turn in the fourth quarter" and that its "principals," one of whom was then a Bank director, Director T, were seeking a change in terms to reduce monthly payments and increase available credit.

83.    The Executive Loan Committee accommodated them, including Director T. On November 21, 2006, acting on Hubbard's recommendation, the committee agreed to reduce United North's monthly payments and provide additional credit, including for United North Loan #01 and #02. The approval *reducing monthly payments and increasing credit* occurred even though in April 2006, the committee conditioned United North Loan #03 for $4 million on *increasing monthly payments* on United North Loan #02 and *decreasing the line of credit limit*

28

for United North Loan #01. Although Director T, a guarantor, would resign from the Board by December 12, 2006, he continued to stay on as an "advisory director."

84.     By Fall 2007, Defendant Hubbard reported by memorandum to the Executive Loan Committee that three of United North's loans, for $6.067 million, collectively, were "past due" and that United North was "behind on some of their vendor payments." By June 2008, compliance officer, Dehne, reported by memorandum to the Bank's audit committee and ultimately to the Board, that he expected United North's debt service requirements to exceed its cash flow *by approximately $511,000*. On January 13, 2009, the Executive Loan Committee approved *a charge-off of $5.342 million* for the Bank's loans for United North**.**

85.     Defendant Hubbard in recommending, and Defendants Luri, Prosser, Segvich, and Thorsen, in approving, United North Loan #02 for $2 million engaged in grossly imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

> a. Defendants failed to identify any reasonably reliable and adequate source of repayment for United North Loan #02. As compliance officer, Dehne, observed about nine months after the loan closed: "The bank is relying heavily upon the real estate firm being more profitable than it has ever been in the past  . . . ." Member C, moreover, was not a reliable repayment source as was apparent from the credit approval report. Nor was there any reliable collateral for this "essentially unsecured" loan.

> b. United North Loan #02 was barred by Loan Policy requirements for unsecured loans. The approval report warned that the loan was "essentially unsecured."

c. Defendants disregarded another Loan Policy rule for prudent loans, namely, that collateral have value and marketability. The loan was "essentially unsecured." As the approval report also warned, any collateral was "illiquid."

d. Defendants could not reasonably conclude that United North would have cash flow sufficient to reach the Loan Policy minimum debt service coverage ratio of $1.20 in available cash for every dollar of debt service, or that there was reason to permit an exception.

e. Defendants did not have current financial information "adequate to support the debt," as the Loan Policy required, including "at a minimum, detailed balance sheets, profit and loss statements, or copies of tax returns and cash flow projections."

f. Defendants, contrary to the Loan Policy, disregarded multiple changes in United North's ownership over that business's only several years of existence, showing instability in management.

g. Defendants had no earnings projections based on reasonable assumptions, as the Loan Policy required. The approval report included no earnings projections for United North, let alone reasonable assumptions for projections.

h. Defendants disregarded United North's limited and erratic earnings history, although the Loan Policy required them to consider earnings stability and upward trends.

    i.   Defendants disregarded information showing United North was financially weak including that it had a *negative* tangible net worth, although the Loan Policy required them to consider the business's financial strength.

    j.   Defendants committed an excessively high and risky amount of the Bank's capital to this single borrower on an "essentially unsecured" basis, given all the circumstances known to them at the time. The Bank's commitments represented *nearly 10 percent* of the Bank's reported capital of $26.445 million as of December 31, 2005.

    k.   Defendants further and excessively increased the Bank's concentration of loans exposed to a downturn in the Chicago real estate market, despite repeated warnings of the Bank's already high exposure to that sector and associated risks.

86.    As a result of the negligence of Defendants Hubbard and Thorsen and gross negligence and breaches of fiduciary duties by Defendants Hubbard, Thorsen, Luri, Prosser, and Segvich, relating to United North Loan #02, the FDIC-R incurred damages exceeding $1.747 million.

87.    Defendant Hubbard in recommending, and Defendants Luri, Prosser, Segvich, Thorsen, Eck, and Shiner, in approving, United North Loan #03 for $4 million likewise engaged in grossly imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

    a.   Defendants failed to identify any reasonably reliable and adequate source of repayment for United North Loan #03.  As compliance officer, Dehne, warned just a few months after the loan closed: "The bank is relying heavily

upon the real estate firm being more profitable than it has ever been in the past and sales and income must increase significantly for the projections to be met." As the approval reports also showed, the loans would be "essentially unsecured" and the "Guarantors cannot afford to service the debt personally."

b. United North Loan #03 was barred by Loan Policy requirements for unsecured loans. The approval reports warned that the loan was "essentially unsecured."

c. Defendants disregarded another Loan Policy rule for prudent loans, namely, that collateral have value and marketability. The loan was "essentially unsecured." As the approval reports also warned, any collateral was "illiquid."

d. Defendants disregarded their own rule setting a $3 million in-house lending limit for loans to related borrowers. The Bank's loans to this borrower would exceed $6.407 million, more than *double* that limit.

e. Defendants' commitment of over $6.407 million in "essentially unsecured" Bank funds to this single borrower was excessively high and risky given all the circumstances known to Defendants at the time. United North's borrowings would exceed $6.407 million or *nearly one-quarter* of the Bank's total reported capital of $27.506 million as of March 31, 2006. And Member S, one of the guarantors, had personal Bank debt of approximately $250,000.

f. Defendants could not reasonably conclude United North would have cash flow sufficient to reach the Loan Policy minimum debt service coverage ratio

of $1.20 in available cash for every dollar of debt service, or that there was reason to permit an exception.

g. Defendants did not have current financial information "adequate to support the debt," as the Loan Policy required, including "at a minimum, detailed balance sheets, profit and loss statements, or copies of tax returns and cash flow projections."

h. Defendants, contrary to the Loan Policy, disregarded multiple changes in United North's ownership over that business's only several years of existence, showing instability in management.

i. Defendants had no earnings projections based on reasonable assumptions, as the Loan Policy required. The approval reports included rosy earnings projections for United North with unreasonable assumptions, as Dehne warned less than five months after loan approval.

j. Defendants disregarded United North's limited and erratic earnings history, although the Loan Policy required them to consider earnings stability and upward trends.

k. Defendants disregarded information showing United North was financially weak including that it had *negative* tangible net worth, although the Loan Policy required them to consider the business's financial strength. By adding $4 million in new debt to fund a buy-out of an owner, with no corresponding increase in its assets, moreover, United North's financial condition would be substantially worse.

l. Defendants committed *nearly a quarter* of the Bank's capital to this single borrower on an "essentially unsecured" basis, an excessively high and risky amount given all the circumstances known to them at the time.

m. Defendants further and excessively increased the Bank's concentration of loans exposed to a downturn in the Chicago real estate market, despite repeated warnings of the Bank's already high exposure to that sector and associated risks.

88. As a result of the negligence by Defendants Hubbard and Thorsen, and gross negligence and breaches of fiduciary duties by Defendants Hubbard, Thorsen, Luri, Prosser, Segvich, Eck, and Shiner, relating to the United North Loan #03, the FDIC-R incurred damages exceeding $3.799 million.

### *Western View and Chicagoview Condominium Construction Loans*

89. Within just over a year, Defendant Friedman recommended, and Defendants Luri, Prosser, Segvich, Thorsen, and Shiner approved nearly $8 million in loans for multiple condominium projects for a single developer, Developer K. Defendant Eck approved the first of those loans, for about $2.264 million, reduced by closing to about $2.24 million. In recommending and approving those loans, Defendants committed *nearly one-third* of the Bank's total capital to that single developer's speculative projects and *again* increased the Bank's already-heavy exposure to known risks resulting from a down-turn in the Chicago real estate market. Defendants did so even though it was readily apparent from the credit approval reports for those loans that there was no reasonable and reliable source for repaying them and the loans otherwise violated multiple standards for safe, sound and prudent banking, including many of Defendants' own rules for prudent lending as stated in the Board-approved Loan Policy.

90.     More specifically, on April 11, 2006, Defendants Luri, Prosser, Segvich, Thorsen, Eck, and Shiner, acting through the Executive Loan Committee and upon the recommendation of Defendant Friedman, approved a loan for approximately $2.265 million to Western View II LLC ("Western View"), with a guaranty from Developer K.  Western View was a limited liability company organized by Developer K, its sole member, to, among other things, acquire land at 4926-30 South Western Avenue in Chicago and build three four-story, four-unit residential and retail condominium buildings on that land (the "4926-30 South Western Project"). The purpose of the loan was to fund the land acquisition and development for the 4926-30 South Western Project (the "4926-30 South Western Loan").

91.     In approving the 4926-30 South Western Loan, Defendants Luri, Prosser, Segvich, Thorsen, Eck, and Shiner relied on a credit approval report by Defendant Friedman showing that loan repayment depended solely upon the 4926-30 South Western Project's success.   It also showed that there were no known or expected pre-sales of any project units. Whether any units would be sold, let alone for the sale prices and profit margins necessary for re-payment was speculative.  Developer K's projected project costs were just that—projections— and with virtually no explanation for them in the approval report.  The approval report explicitly warned of the "[s]peculative nature" of the loan.  It also showed that in a "Worst-Case Scenario" of a rental rather than unit sales: "The property cannot afford to service the proposed debt service as rental even at market rates."

92.     For Developer K, the approval report warned of the "[i]nability of guarantor to personally service debt."   It also included stale, more-than-a-year-and-a-quarter-old income statement information for Developer K, showing for year-end 2004 a debt service coverage ratio of .47, meaning only 47 cents in cash available for every dollar of debt service.  It showed even

worse ratios for the two prior year ends, 2002 and 2003. It also showed Developer K's net worth was largely from equity in highly-leveraged real estate. Developer K's net worth was positive, moreover, only because of values assigned to real estate. However, the approval report did not analyze the reliability of those values.

93.     The approval report also explicitly acknowledged "Loan Policy Exceptions" because: "The guarantor's pending commitments exceed the Bank's in house lending limit." In addition to the $2.265 million loan to Western View for the 4926-30 South Western Project, Defendant Freidman also simultaneously recommended and the Executive Loan Committee also simultaneously approved a loan for nearly $3.026 million for a bigger mixed-use condominium development, just blocks North at 4150 South Western (the "4150 South Western Loan"). The 4150 South Western Loan also was guaranteed by Developer K. The recommended loan commitments for Western View and Developer K thus were nearly $5.3 million—*well over* the Bank's $3 million in-house lending limit and *over 19 percent* of the Bank's reported total capital of $27.506 million as of March 31, 2006.

94.     With the proposed new Bank debt, Developer K would have *at least $9.134 million* in potential obligations to all lenders, with *just $1.1 million* in reported liquid assets. The approval report showed that Developer K had multiple unfinished projects financed by lenders other than the Bank, including new home construction in Florida and, in Chicago, a 12-unit South-side condominium conversion project, a 36-unit construction project at 4000 South Western, and a West Chicago Avenue condominium project.

95.     Despite what the approval report showed about Western View and Developer K, the 4926-30 South Western Loan closed on May 19, 2006, for a maximum loan amount of $2.24 million, a little less than the amount approved. Only interest payments were required before

maturity, but from $190,000 in Bank loan proceeds. Thus, neither Western View, nor Developer K would have to provide funds separately to service the loan for the initial term.

96.     Then, *less than five months* after the 4926-30 South Western Loan closed, the Bank's compliance officer, Dehne, submitted his September 5, 2006 Warning Memorandum to Defendants Thorsen, Hubbard, and Shiner, which also went to the full Board. Dehne's memorandum included the following conclusions about Developer K:

> a.    "Together with the condominium projects Ravenswood is financing (much larger than the other projects [Developer K] has done at the bank) there is a concern that the maker could be doing too many projects at one time."
>
> b.    Developer K's "income would not allow him to service the debt if there are delays . . . ."
>
> c.    Developer K's "net worth does not allow [Developer K] much of a cushion in the event of a problem . . . ."
>
> d.    Referencing Developer K, among others: "The bank continues to make sizeable loans . . . to some developers who do not appear to have sufficient other assets and/or income to provide additional protection for the bank in case the project is delayed or sales do not develop as projected."

97.     The 4926-30 South Western Loan had an 18-month term and an expected pay-off in November 2007. But the project was not completed by then, let alone sold off so that Bank could be repaid. By November 23, 2007, the Bank advanced $819,645 in funds for the 4926-30 South Western Project, including for land acquisition, interest payments, and construction of the foundation and some structural steel. According to the approval report for the November 23, 2007 renewal, Developer K stopped work for the project until units started closing for the 4150

South Western Project—"to avoid having too many unit (sic) available at one time on the market." The two projects were very similar, on the same street, and within blocks of each other, and potentially competitors.

98.     The 4926-30 South Western Loan was renewed on November 23, 2007 for six months until May 23, 2008, and then renewed again for two months until July 23, 2008.  It then was capped at just over $867,000 and renewed until December 23, 2008, and then extended to July 1, 2009.  There was no construction beyond the foundation and limited structural steel.

99.     Although Developer K's Western View projects were incomplete and the Bank was not been repaid, on May 11, 2007, Defendants Luri, Prosser, Segvich, Thorsen, and Shiner, acting through the Executive Loan Committee and upon the recommendation of Defendant Friedman, approved *four more multi-million dollar loans* for Developer K.  Those loans were to Chicagoview II LLC ("Chicagoview"), a special purpose limited liability company organized by Developer K, its sole member, to acquire land on Chicago's near-West side and build six four-unit, four-story residential and retail condominium buildings on it (the "Chicagoview Project").

100.     Those Defendants on May 11, 2007 recommended and approved loans for the Chicagoview Project for approximately $3.476 million (loan # 830445004), $1.118 million (loan # 830445002), and $1.127 million (loan # 830445003) (collectively, the "Three Chicagoview Loans"). They also approved a loan for the project that day for approximately $1.16 million (loan # 830445001).

101.     In approving the Chicagoview loans, Defendants Luri, Prosser, Segvich, Thorsen, and Shiner relied on credit approval reports prepared by Defendant Friedman, which showed that the purpose of those loans was to fund the land acquisition and development for the Chicagoview

Project.  Each Chicagoview loan was guaranteed by Developer K, the guarantor of the Bank's loans for the two incomplete Western View Projects.

102.     The approval reports acknowledged as "Loan Policy Exceptions" that: "With the approval of the proposed loans the guarantor's commitments will exceed the Bank's legal lending limit"—although loan disbursements were within that limit. The four new loans to Chicagoview would raise the Bank's loan commitments for Developer K to just over $9.2 million, over *triple* the Bank's $3 million in-house lending limit and *nearly one-third* of the Bank's reported total capital of about $31.401 million as of March 31, 2007.

103.     The approval reports also showed that repayment depended upon the Chicagoview Project's success.  But the reports included no information from which to conclude reasonably that the project would succeed.  Chicagoview, according to the reports, had no assets other than the land to be developed with Bank funds and contemplated contributions from Developer K.   Based on the approval reports, Chicagoview also expected partial seller financing to acquire the land for the Chicagoview Project.  There were no condominium unit pre-sales; nor was any specific potential pre-sale cited in the approval reports. Whether any unit would be sold, let alone for the sale price and profit margin necessary for re-payment was speculative.  Each approval report explicitly warned of the "[s]peculative nature" of each loan.

104.     The approval reports also showed a "Worst-Case Scenario"—namely, that "[u]sing the average for the apartments and the low end for the commercial space the property will not generate cash flow as a rental property."  The approval reports projected annual cash flow from a rental falling about $155,000 *less* than needed to service the Bank's loans, and projected debt service coverage ratios ranging from .72 to .75, *well below* the 1.2 to 1 minimum required ratio under the Loan Policy.

105.    The approval reports also continued to show that Developer K had multiple

unfinished projects financed by lenders other than the Bank, including for new home

construction in Florida and a 12-unit condominium conversion project on Chicago's South side.

Developer K, moreover, had not completed construction of, let alone closed on selling, any units

for the two Western View Projects, financed by the Bank in May 2006.

106.    For Developer K, the approval reports included stale, more-than-a-year-and-a-

quarter-old income statement information showing for year-end 2005 a debt service coverage

ratio of .16, meaning Developer K had only 16 percent of the cash needed for servicing debt. Put

another way, the approval reports showed that for year-end 2005, there was just-under $110,000

available for debt service and, with the proposed debt included, just-over $703,000 in debt to

service—*so a nearly 700 percent short fall*. The debt service coverage ratio for Developer K,

which was *far worse* than when the 4926-30 South Western Loan was approved in April 2006,

showed *rapidly deteriorating* cash flow for Developer K, and showed Developer K did not have

cash flow close to sufficient for repaying these loans.  And as readily apparent from the approval

reports, that debt service ratio did not include anywhere close to the amount of interest payable

on the nearly *$30 million in debt* listed in Developer K's balance sheet.

107.    The approval reports also showed Developer K's net worth was largely from

equity in highly-leveraged real estate.  They showed Developer K supposedly had about $13.17

million in Bank-adjusted net worth, including about $1.3 million in cash, Developer K's only

reported liquid asset.  And they also showed Developer K had nearly $30 million in debt, *before*

including the proposed new debt of nearly $6.9 million for the Chicagoview Project and over

*seven times* the $4.155 million in debt Developer K reported to the Bank just over one year

earlier. Developer K's assigned net worth was positive, moreover, only because of values

assigned to real estate; but the approval reports did not analyze the reliability of those values. Defendants by May 2007 were well aware of the downturn in the real estate market and thus could not reasonably rely upon those assigned values.

108.    Despite what the approval reports showed about Chicagoview and Developer K, the loans for $3.476 million and $1.16 million closed on June 14, 2007, and the loans approved for $1.118 million and $1.127 million were combined into a loan for just over $2.245 million (loan # 830445005), which closed on August 5, 2007.  Only interest payments were required before the Three Chicagoview Loans matured, but from $400,000 in Bank loan proceeds, rather than from Chicagoview or Developer K.

109.    As the Bank's compliance officer, Dehne, stressed in his September 5, 2006 and January 2, 2007 Warning Memoranda delivered to Defendants Thorsen, Hubbard, and Shiner and then to the full Board *before* approval of the Chicagoview loans:

   a.    Developer K's "net worth" "does not allow [Developer K] much of a cushion in the event of a problem . . . ."

   b.    Developer K's "income would not allow him to service the debt if there are delays . . . ."

   c.    Referencing Developer K, among others: "The bank continues to make sizeable loans  . . .  to some developers who do not appear to have sufficient other assets and/or income to provide additional protection for the bank in case the project is delayed or sales do not develop as projected."

   d.    "Together with the condominium projects Ravenswood is financing (much larger than the other projects [Developer K] has done at the bank) there is a concern that the maker could be doing too many projects at one time."

41

Yet Defendant Friedman recommended, and Defendants Luri, Prosser, Segvich, Thorsen, and Shiner approved, the Chicagoview loans, substantially increasing the Bank's exposure on Developer K loans and funding yet another substantial project for Developer K.

110.    The $3.475 million Chicagoview loan matured on January 1, 2009, and the $2.245 million Chicagoview loan matured on October 1, 2009.  But the Chicagoview Project was not completed, let alone sold off so the Bank could be timely repaid.

111.    Developer K's 4926-30 South Western and Chicagoview Projects were both failures.

112.    Defendant Friedman in recommending, and Defendants Luri, Prosser, Segvich, Thorsen, Eck, and Shiner in approving, the 4926-30 South Western Loan for Developer K engaged in grossly imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

    a.  Defendants failed to identify any reasonably reliable and adequate source of repayment for the 4926-30 South Western Loan. Western View had no income, only speculative income from potential condominium unit sales at projected prices and profit margins. The approval report explicitly warned of the loan's "[s]peculative nature" and showed speculative rent estimates as insufficient to service the debt. The approval report also acknowledged the "[i]nability of guarantor to personally service debt."

    b.  Defendants disregarded their own rule setting a $3 million in-house lending limit for loans to related borrowers. Ravenswood's loan commitments to Developer K would be nearly $5.3 million, *nearly double* that limit.

c.  Defendants' loan commitments of nearly $5.3 million represented *over 19 percent* of the Bank's reported total capital of $27.506 million as of March 31, 2006, just before the approval date—an excessively high and risky percentage given all the circumstances known to Defendants about this "speculative" loan at the time.

d.  Defendants disregarded another Loan Policy rule for prudent loans, namely, that collateral have value and marketability. The collateral, a mortgage on the 4926-30 South Western Project and assignment of rents, was insufficient to secure debt repayment.

e.  Defendants could not reasonably conclude Western View would have cash flow sufficient to reach the Loan Policy minimum debt service coverage ratio of $1.20 in available cash for every dollar of debt service, or that there was reason to permit an exception.

f.  Defendants did not have current financial information "adequate to support the debt," as the Loan Policy required, including "at a minimum, detailed balance sheets, profit and loss statements, or copies of tax returns and cash flow projections."

g.  Defendants had no earnings projections for Western View based on reasonable assumptions, as the Loan Policy required. The approval report included only Developer K's speculative, projected sell-off figure and profit margin and speculative rent estimates showing rents insufficient to service the debt. The project included additional risk from Developer K undertaking a similar project simultaneously nearby, thereby increasing the number of

units available to buyers in that same market and creating a potential

competition among the projects for the same buyers.

h.    Defendants disregarded another Loan Policy rule for prudent loans, namely,

that the borrower has able management. Defendants could not reasonably

conclude from the information available to them that Developer K could

complete and sell-off multiple large projects simultaneously, including in the

same area and out-of-state, and repay loans for those projects from multiple

lenders, including the Bank.  The Bank's compliance officer, Dehne, warned

of this risk less than five months after the loan closed in his September 5,

2006 Warning Memorandum.

i.    Defendants further and excessively increased the Bank's concentration of

loans exposed to a downturn in the Chicago real estate market, despite

repeated warnings of the Bank's already-high exposure to that sector and

associated risks.

113.    As a result of the negligence by Defendants Thorsen and Friedman, and gross

negligence and breaches of fiduciary duties by Defendants Thorsen, Friedman, Luri, Prosser,

Segvich, Eck and Shiner, relating to the 4926-30 South Western Loan for Developer K, the

FDIC-R incurred damages exceeding $666,000.

114.    Defendant Friedman in recommending, and Defendants Luri, Prosser, Segvich,

Thorsen, and Shiner in approving, the Three Chicagoview Loans for Developer K similarly

engaged in grossly imprudent, unsafe, and unsound lending practices and violated the Loan

Policy as evidenced by, among other things, the following:

a. Defendants failed to identify any reasonably reliable and adequate source of repayment for each of the Three Chicagoview Loans. Chicagoview had no income, only speculative income from potential condominium unit sales if the project was completed and sold at Developer K's projected profit-margins and sales-prices when, as Defendants knew, the Chicago area real estate market was in decline. Dehne, the Bank's compliance officer, had warned, moreover, that Developer K's "income would not allow him to service the debt if there are delays . . . ." And that warning was *before* adding nearly $6.9 million in new debt for the Chicagoview Project. Developer K's cash available for debt service was nearly *700 percent* less than needed for debt service, according to the approval report and far less when considering debt service for his *nearly $30 million* in listed liabilities.

b. Defendants disregarded their own rule setting a $3 million in-house lending limit for loans to related borrowers. Ravenswood's loan commitments to Developer K would exceed $9.2 million, *nearly one-third* of the Bank's total reported capital of $31.401 million as of March 31, 2007, just before approval. The approval reports explicitly acknowledged as "Loan Policy Exceptions" that: "With the approval of the proposed loans the guarantor's commitments will exceed the Bank's legal lending limit."

c. Defendants commitment of over $9.2 million to Developer K was excessively high and risky given the percentage of Bank capital it represented, market conditions, that Developer K had other unfinished

condominium projects and associated unpaid Bank loans, and all of the other

circumstances known to Defendants at the time.

d.   Defendants disregarded another Loan Policy rule for prudent loans, namely,

that collateral have value and marketability.  As revealed in the approval

reports, the collateral, a mortgage on the Chicagoview Project and

assignment of rents, was insufficient to secure debt repayment.  Relying on

that collateral was particularly risky given market conditions then known to

Defendants.

e.   Defendants could not reasonably conclude Chicagoview would have cash

flow sufficient to reach the Loan Policy minimum debt service coverage ratio

of $1.20 in available cash for every dollar of debt service, or that there was

reason to permit an exception.

f.   Defendants did not have current financial information "adequate to support

the debt," as the Loan Policy required, including "at a minimum, detailed

balance sheets, profit and loss statements, or copies of tax returns and cash

flow projections."

g.   Defendants had no earnings projections for Chicagoview based on reasonable

assumptions, as the Loan Policy required. The approval reports included only

Developer K's speculative, projected sell-off figure and profit margins and

speculative rent projections showing rent far less than required for debt

service.  Defendants, moreover, had knowledge of deteriorating market

conditions for selling condominiums.

h.  Defendants disregarded another Loan Policy rule for prudent loans, namely, that the borrower has able management. Defendants could not reasonably conclude that Developer K could complete and sell-off multiple large projects simultaneously, including in the same area and out-of-state, and repay loans for those projects from multiple lenders, including the Bank— particularly when they knew of adverse market conditions.  The Bank's compliance officer, Dehne, warned Defendants of this risk at least by memoranda dated September 5, 2006 and January 2, 2007, long before approval.

i.  Defendants further and excessively increased the Bank's concentration of loans exposed to the downturn in the Chicago real estate market despite repeated warnings of the Bank's already high exposure to that sector and associated risks.

115.    As a result of the negligence by Defendants Thorsen and Friedman and gross negligence and breaches of fiduciary duties by Defendants Thorsen, Friedman, Luri, Prosser, Segvich, and Shiner, relating to the Chicagoview Loans for Developer K, the FDIC-R incurred damages exceeding $2.131 million.

*Bell Condominium Conversion Loans*

116.    Within less than 18 months, through December 9, 2008, Defendant Hubbard recommended and approved, and Defendants Luri, Prosser, Segvich, Thorsen, and Shiner approved nearly $1.9 million in loans for a speculative condominium-conversion project, originally for Developers M and O, and later just for Developer M, *again* increasing the Bank's already-heavy exposure to known risks resulting from a down-turn in the Chicago real estate

market.  Defendants did so even though it was readily apparent from the credit approval reports for these loans that there was no reasonable and reliable source for repaying them and the loans otherwise violated banking standards for safe, sound and prudent banking, including many of Defendants' own rules for prudent lending as stated in the Board-approved Loan Policy.

117.    More specifically, on July 31, 2007, Defendants Hubbard, Luri, Prosser, Segvich, Thorsen, and Shiner, acting through the Executive Loan Committee and based on Defendant Hubbard's recommendation, approved a loan for over $1.59 million to a limited liability company to be formed, ultimately named 7255 N. Bell LLC ("Bell"), with guaranties from Developers M and O.  Bell was a special purpose limited liability company organized by Developers M and O, its sole members, to acquire an apartment building at 7255 North Bell on Chicago's North side and convert the building into six residential condominium units (the "Bell Project").

118.    The purpose of Ravenswood's loan was to refinance a loan from Great Bank that financed the acquisition of the apartment building and limited construction work and to provide additional funds to complete construction and pay interest on the Bank's proposed loan (the "Initial Bell Loan").  Great Bank, according to the credit approval report for the loan by Defendant Hubbard, would not renew its Bell Project loan.  As such, Bell needed a new lender.

119.    Defendants Luri, Prosser, Segvich, Thorsen, and Shiner relied on Hubbard's approval report showing loan repayment depended upon the Bell Project's success, but that the project's success was highly speculative.  Bell would have no assets other than the apartment building to be converted into six condominium units with Bank funds and contemplated contributions from Developers M and O amounting to less than 10 percent of estimated project costs.  There were no pre-sales of any project units; nor were pre-sales a condition of making the

loan.  Whether any unit would be sold, let alone for the sale price and profit margin necessary for re-payment, was speculative.  The approval report explicitly warned of loan weaknesses due to "[m]arket risk regarding the current slow selling environment in the real estate market" and that "[l]oan payoff is dependent from sales of all six condo units."  It warned in a related vein that the "deal was thin" with only a 3.7 percent projected profit on each unit sale and of the "absorption risk"—the ability of the market to absorb the additional units—"present in the current market environment."  It even projected a loss exceeding $293,000 with only a 20 percent drop in sales, meaning about one less unit sold or a 20 percent reduction in unit sales prices.  It further projected a loss exceeding $279,000 with a 20 percent cost increase.

120.    The approval report also showed that Bank's outstanding balances on loans guaranteed by Developer M already exceeded the Bank's $3 million in-house lending limit by over $1 million or over 33 percent.  Developers M and O also simultaneously sought a loan for nearly $2.015 million from the Bank for refinancing another bank's loan for a condominium conversion project in nearby Evanston, Illinois.  That loan also would be guaranteed by Developers M and O and, with the Initial Bell Loan, raise the Bank's loan commitments for Developers M and O to nearly $9.1 million, *over triple* the Bank's in-house $3 million lending limit and over *one-quarter* of the Bank's reported total capital of $32.465 million as of June 30, 2007.  The approval report explicitly acknowledged "Loan Policy Exceptions" because: "The guarantors' outstanding commitments exceed the Bank's legal lending limit," noting that "sale of a loan participation will be required."

121.    The approval report also showed that Developers M and O had numerous unfinished projects, including eight Bank-financed projects and multiple projects financed by

other lenders.  It listed 31 and 24 real estate holdings for Developers M and O, respectively, with *nearly $33 million in listed debt—besides the proposed new Bank debt*.

122.     For Developer M, the approval report included stale tax return information showing cash-flow for one year only, for year-end 2005, although the loan approval was for July 31, 2007.  It also showed Developer M had a debt service coverage ratio of .51, meaning only 51 percent of the cash needed for servicing debt.  Put another way, it showed that for year-end 2005 for Developer M, there was just-under $134,000 available for debt service and, with the proposed debt included, just-under $261,000 in debt to service—so a nearly 100% shortfall in funds needed for debt service.

123.     Developer M's one-year-old stale and self-prepared balance sheet described in the approval report, namely, as of July 2006, included cash of only $350,000 and no other liquid assets.  Developer M's Bank-adjusted net worth was about $7.121 million and almost entirely from $30.261 million in "market" values assigned to highly-leveraged real estate. The approval report did not analyze the reliability of those values, nor explain the real estate ownership, including whether owned outright or indirectly.

124.     Developer M, according to the approval report, moreover, had nearly $19.465 million in debt, including about $19.350 million in mortgage debt.  And Developer M sought approximately $3.650 million in additional debt as guarantor—bringing total debt to about $23 million. Developer M's $350,000 in reported cash was only about 17 percent of cash needed for one year of interest alone, at the Initial Bell Loan floor interest rate, on $23 million in debt.  It was readily apparent from the approval report, moreover, that the debt service ratio for Developer M included only a small fraction of interest payable on nearly $19.465 million in debt.

125.    As shown in the approval report, Defendant Hubbard's debt service coverage ratio for Developer O also was based on a tax return for only one year. That single return, moreover, was over a year and a half old, for year-end 2005, for a July 31, 2007 loan approval.  The approval report included no income statement or other cash flow information for Developer O for the most recent year and a half and, for real estate developers generally, the market had changed dramatically from 2005.  The single stale return cited in the approval report showed about $1.479 million in net income for Developer O.  However, about $1.677 million was from capital gains, offset by $223,000 rental-activity loss, with just over $24,000 in interest income and no other income.  That Developer O had a large capital gain in one year was no basis for concluding Developer O would have similarly large future income. There was no reasonable basis to conclude from the approval report that Developer O would have sufficient cash for debt service.  Developer O in fact would be unable to service any of the Bank debt.

126.    Developer O's one-year-old stale and self-prepared balance sheet cited in the approval report, namely, as of August 2006, included cash of $1.171 million and about $168,000 for "marketable" securities.  The approval report did not address Developer O's cash and liquidity position as of the July 31, 2007 approval date.

127.    Developer O's stale Bank-adjusted net worth was $6.915 million and almost entirely from about $22.2 million in "market" values assigned to highly-leveraged real estate. The approval report did not include any analysis of the reliability of those values, nor explain the real estate ownership, including whether owned outright or indirectly.

128.    It also showed Developer O had over $14.42 million in mortgage debt. And Developer O was seeking an additional $3.65 million in debt as guarantor—bringing total debt to over $18 million. Developer O's $1.171 in reported cash from August 2006, if still available,

was not enough to cover even one year of interest on $18 million in debt at the floor interest rate for the Initial Bell Loan, let alone principal or any payment for more than a year. It was readily apparent from the approval report, moreover, that the debt service ratio for Developer O included only a small fraction of the interest payable on nearly $18 million in existing and proposed debt.

129. As the Bank's compliance officer, Dehne, stressed in his September 5, 2006 and January 2, 2007 Warning Memoranda delivered to Defendants Thorsen, Hubbard, and Shiner and then to the full Board *before* approval of the Initial Bell Loan: "The bank continues to make sizeable loans . . . to some developers who do not appear to have sufficient other assets and/or income to provide additional protection for the bank in case the project is delayed or sales do not develop as projected." Developers O and M were two of the developers within that category.

130. Despite what the approval report showed, Dehne's warnings, and multiple additional warnings about adverse market conditions and commercial real estate loan concentrations, the Initial Bell Loan closed on August 10, 2007, although the amount decreased from $1.59 million to $1.502 million. Only interest payments were required before the Initial Bell Loan matured, but from $126,000 in Bank loan proceeds, rather than from the borrower or Developers M or O.

131. The Initial Bell Loan term was one year. Thus, sell-off of the Bell Project and pay-off of the Initial Bell Loan was expected by August 2008. By August 13, 2008, the Bank disbursed nearly $1.404 million of the $1.502 million Initial Bell Loan, including for refinancing the Great Bank loan, interest payments, and construction. But the Bell Project was not complete, let alone sold so that the Bank could be timely repaid. The Executive Loan Committee extended the Initial Bell Loan effective August 13, 2008, for three months until November 13, 2008.

132.    By September 16, 2008, Defendant Hubbard reported to the Executive Loan Committee that Developer O was delinquent on a personal unsecured Bank loan for only $237,500 and claimed insufficient personal funds to repay the personal loan and no personal equity to use to borrow funds for repayment.  The Executive Loan Committee extended the Initial Bell Loan effective November 13, 2008 for another three months, until February 13, 2009 and on December 9, 2008 approved releasing Developer O from Developer O's guaranty, with the release effective December 26, 2008.  By December 9, 2008, the construction budget for the incomplete Bell Project reportedly was exceeded by about $217,000 and Bell and Developer M asked the Bank for additional funds to pay construction expenses, interest on the Initial Bell Loan, and real estate taxes and for insurance for the Bell property.  So on December 9, 2008, Defendants Hubbard, Luri, Prosser, Segvich, Thorsen, and Shiner, acting through the Executive Loan Committee and based on Defendant Hubbard's recommendation, approved a loan for over $278,000 to Bell to cover those expenses and interest for the new loan, with a guaranty from Developer M (the "Bell Cost-overrun and Interest Reserve Loan").

133.    Defendants Luri, Prosser, Segvich, Thorsen, and Shiner relied on a credit approval report by Defendant Hubbard showing that: "The project is expected to produce a loss;" "The property cannot afford the primary loan as a rental;" and the guarantor "has an inability to support the proposed debt personally in 2007."  It also showed Developer M's debt service coverage ratio, based on stale income tax information from year-end 2007 as .47, meaning 47 cents in cash available for every dollar of debt to service.  It also acknowledged as a Loan Policy exception that "The Guarantor's commitments exceed the Bank's in house lending limit" and the "loan is likely to be a supervisory LTV [(loan-to-value)] exception."  It assigned a "5" risk rating to the loan, meaning it was a special mention, watch list loan and, thus, highly risky.

Commitments totaled over $8.1 million, representing *over 38 percent* of the Bank's reported total capital of $21.081 million as of December 31, 2008. Without the new debt, outstanding balances also totaled over $6.2 million, representing *almost 30 percent* of that reported capital figure.

134. Despite what the approval report showed and other warnings, the Bell Cost-overrun and Interest Reserve Loan closed on December 12, 2008. It had a term until June 12, 2009. Only interest payments were required before the loan matured, but from $61,000 in Bank loan proceeds, rather than from the borrower or Developer M. The $61,000 reserve, according to the approval report, was for interest on both Bell loans.

135. Both Bell loans were extended effective February 13, 2009, then again until June 13, 2009. By March 3, 2009, almost two years after approval of the Initial Bell Loan, Hubbard reported to the Executive Loan Committee that a model unit finally was finished for the Bell Project, but no other units were complete.

136. Defendant Hubbard in recommending and approving, and Defendants Luri, Prosser, Segvich, Thorsen, and Shiner in approving, the Initial Bell Loan for $1.59 million, engaged in grossly imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

    a. Defendants failed to identify any reasonably reliable and adequate source of repayment for the Initial Bell Loan. Bell had no income, only speculative income from potential condominium sales if the Bell Project was completed and sold at projected sales prices and for projected costs. The approval report warned of "[m]arket risk regarding the current slow selling environment in the real estate market," of "absorption risk" and that the "deal

was thin." Developer M's debt service coverage ratio shown in the approval report was .51 and based on stale tax return information for only one year and, as was obvious from the approval report, failed to consider all of Developer M's substantial debt. Developer O's ability to service debt likewise was based on stale tax return information for one year only and otherwise unreliable, at least because of the nature of Developer O's income and the obvious omission of interest for multiple millions in debt listed for Developer O in the approval report.

b. Defendants disregarded their own rule setting a $3 million in-house lending limit for loans to related borrowers. Ravenswood's loan commitments to Developers M and O would exceed $9.1 million, *triple* the in-house limit. The approval report explicitly acknowledged "Loan Policy Exceptions" because: "The guarantors' outstanding commitments exceed the Bank's legal lending limit," noting that "sale of a loan participation will be required."

c. Defendants committed an excessively high amount of the Bank's capital to these developers given all the circumstances. Before the addition of any new debt, the outstanding balance of loans to these developers already was over $4 million, representing *over 12 percent* of the Bank's reported total capital of about $32.465 million as of June 30, 2007. Loan commitments represented over *28 percent* of the Bank's reported total capital as of June 30, 2007.

d. Defendants disregarded another Loan Policy rule for prudent loans, namely, that collateral have value and marketability. The collateral was a mortgage and assignment of rents for the Bell Project and *second* mortgage and

55

assignment of rents for property at 4600 West Touhy in Lincolnwood, Illinois. But it was insufficient to secure debt repayment. As the approval report acknowledged, "the Bell property value is not sufficient to meet the required 80% loan to value . . ." under the Loan Policy. Given the rapidly declining real estate market, the early-January 2007 appraisal cited in the approval report for the Touhy property for a July 31, 2007 loan was unreliable for concluding that property was viable collateral.

e.  Defendants could not reasonably conclude that Bell would have cash flow sufficient to reach the Loan Policy minimum debt service coverage ratio of $1.20 in available cash for every dollar of debt service, or that there was reason to permit an exception.

f.  Defendants did not have current financial information "adequate to support the debt," as the Loan Policy required, including "at a minimum, detailed balance sheets, profit and loss statements, or copies of tax returns and cash flow projections."

g.  Defendants had no earnings projections for Bell based on reasonable assumptions, as the Loan Policy required. The approval report included Developer M and O's projected sell-off figures, which were highly speculative given adverse market conditions and the "thin" profit margins, acknowledged in the approval report and otherwise known to Defendants. The approval report also included projected project expenses, which were mere estimates. Even the projections, moreover, showed particularly high

risk given that the project would be profitable only if *all* of the units sold for the projected sales price and the projected expenses were accurate.

h.  Defendants disregarded another Loan Policy rule for prudent loans, namely, that the borrower has able management. Defendants could not reasonably conclude that Developers M and O could complete and sell-off multiple large projects simultaneously and repay loans for those projects from multiple lenders, including the Bank for the Bell Project and eight other development projects—particularly in adverse market conditions. *Before* Defendants recommended or approved the Initial Bell Loan, the Bank's compliance officer, Dehne, warned Defendants at least by his September 5, 2006 and January 2, 2007 Warning memoranda of this risk for other similar developers, a risk that applied equally to Developers M and O.

i.  Defendants further and excessively increased the Bank's concentration of loans exposed to the downturn in the Chicago real estate market, despite repeat warnings of the Bank's already high exposure to that sector and associated risks.

137.    Defendant Hubbard in recommending and approving, and Defendants Luri, Prosser, Segvich, Thorsen, and Shiner in approving, the Bell Cost-overrun and Interest Reserve Loan for $278,000 also engaged in grossly imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

a.  Defendants failed to identify any reasonably reliable and adequate source of repayment for the Bell Cost-overrun and Interest Reserve Loan. The approval report stated the "project is expected to produce a loss" and the

"property cannot afford the primary loan as a rental."  The approval report stated the guarantor "has an inability to support the proposed debt in 2007"—the most recent, albeit stale income information cited.  Developer M's debt service coverage ratio shown in the approval report was .51 and as such, Developer M had only 51 cents in cash available for every dollar of debt to service.

b.  Defendants disregarded their own rule setting a $3 million in-house lending limit for loans to related borrowers.  Ravenswood's loan commitments to Developer M would exceed $8.1 million, nearly *triple* that limit. The approval report explicitly acknowledged "Loan Policy Exceptions" because: "The Guarantor's commitments exceed the Bank's in house lending limit."

c.  Defendants committed over $8.1 million in Bank funds to Developer M, representing *over 38 percent* of the Bank's reported total capital as of December 31, 2008 of $21.081 million, an excessively high and risky commitment given all the circumstances known to Defendants at the time.  Outstanding loan balances represented *almost 30 percent* of that reported capital figure, before including any new debt.

d.  Defendants disregarded another Loan Policy rule for prudent loans, namely, that collateral have value and marketability.  The collateral was a *junior* mortgage and assignment of rents for property at 2277 West Howard in Chicago.  Given the rapidly declining real estate market, the August 2005 appraisal cited in the approval report for the Howard property for a

December 2009 loan was an unreliable source for concluding it was viable collateral.

e.  Defendants could not reasonably conclude Bell would have cash flow sufficient to reach the Loan Policy minimum debt service coverage ratio of $1.20 in available cash for every dollar of debt service, or that there was reason to permit an exception.  Defendants did not have current financial information "adequate to support the debt," as the Loan Policy required, including "at a minimum, detailed balance sheets, profit and loss statements, or copies of tax returns and cash flow projections."

f.  Defendants had *negative* earnings projections for Bell.

g.  Defendants disregarded another Loan Policy rule for prudent loans, namely, that the borrower has able management.  Developer M still had multiple open Bank-financed development projects and multiple additional development projects financed elsewhere.  The approval report showed many of those Bank-financed projects, including the Bell Project, were assigned 5 risk ratings, meaning high-risk, watch list and special mention loans.  Developer M's partner, Developer O, had severed his ties with Developer M.  The Bell Project was far behind schedule, and the Initial Bell Loan was out of balance. Defendants could not reasonably conclude that Developer M would complete and sell off the Bell Project and repay the Bank's loan.

h.  Defendants further and excessively increased the Bank's concentration of loans exposed to the downturn in the Chicago real estate market, despite

repeated warnings of the Bank's already high exposure to that sector and associated risks.

138.     As a result of the negligence by Defendants Thorsen and Hubbard and gross negligence and breaches of fiduciary duties by Defendants Thorsen, Hubbard, Luri, Prosser, Segvich, and Shiner relating to the two Bell Loans, the FDIC-R incurred damages exceeding $594,000 for the Initial Bell Loan and $222,000 for the Bell Cost-overrun and Interest Reserve Loan.

## V.     CLAIMS FOR RELIEF

### COUNT I
### GROSS NEGLIGENCE CLAIMS AGAINST ALL DEFENDANTS
### UNDER 12 U.S.C. § 1821(k)

139.     The FDIC-R realleges and incorporates into this paragraph by reference each of the allegations in paragraphs 1 through 138 as though fully stated in this paragraph.

140.     Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") holds directors and officers of financial institutions personally liable for loss or damage caused by their "gross negligence," as defined by applicable state law.

141.     Illinois law defines gross negligence as "very great negligence," but something less than willful, wanton, or reckless conduct.

142.     Defendants were directors, both directors and officers and, in one case, an officer of the Bank.

143.    As directors, both directors and officers, and an officer of the Bank, Defendants owed a duty to use reasonable care, skill, and diligence concerning the eight Loan Transactions including, without limitation, by:

    a.   complying with the Loan Policy and ensuring that the loans they recommended or approved complied with the Loan Policy;

    b.   conducting proper due diligence on each proposed loan and informing themselves about the risks the loan posed before recommending or approving it;

    c.   ensuring that the loans they recommended or approved were underwritten in a safe and sound manner and that appropriate and current financial documentation was required and provided;

    d.   ensuring that the loans they recommended or approved had reasonably reliable and adequate sources of repayment identified;

    e.   ensuring that the loans they recommended or approved were to creditworthy borrowers;

    f.   ensuring that the loans they recommended or approved were secured by sufficiently valuable collateral and backed by effective payment guaranties to prevent or minimize the risk of loss;

    g.   ensuring that safe and sound loan to value ratio limits were followed;

    h.   ensuring that the loans they recommended or approved did not result in the extension of excessively large, unsafe, or unsound amounts of credit to one borrower or its affiliates;

    i.    obtaining and evaluating information that demonstrated the feasibility and marketability of acquisition, development, and construction projects to ensure that they were likely to result in a repayment of the loan upon project completion;

    j.    ensuring that the loans they recommended or approved did not violate applicable banking laws and regulations;

    k.    ensuring proper loss recognition on the loans and that new loans were not made to delay loss recognition on prior loans, including by providing for interest payments;

    l.    ensuring that the loans they recommended or approved did not create unsafe and unsound concentrations of credit;

    m.    properly monitoring the performance of loans to minimize the risk of loss; and

    n.    heeding warnings by the FDIC, IDFPR, and others, such as the Bank's compliance officer and outside auditor, about the Bank's lending operations.

144.    Given the warnings by the FDIC, IDFPR and others, such as the Bank's compliance officer and outside auditor, and their knowledge of the declining or at least impaired Chicago real estate market, Defendants' duties were heightened.

145.    Defendants, in causing the eight Loan Transactions to be approved, breached their duties and were grossly negligent including by, among other things:

    a.    disregarding the Loan Policy in recommending or approving the eight Loan Transactions on terms that violated the Loan Policy;

    b.    failing to conduct proper due diligence on each of the Loan Transactions and failing to inform themselves about the risks the loans posed before recommending or approving them;

c. failing to ensure that the Loan Transactions were underwritten in a safe and sound manner and that appropriate and current financial documentation was required and provided;

d. failing to ensure that the Loan Transactions had reasonably reliable and adequate sources of repayment identified;

e. recommending or approving the Loan Transactions for un-creditworthy borrowers;

f. failing to ensure that the Loan Transactions were secured by sufficiently valuable collateral and guaranties to prevent or minimize the risk of loss;

g. failing to ensure that safe and sound loan to value ratio limits were followed;

h. failing to ensure that the loans they recommended or approved did not result in the extension of excessively large, unsafe, or unsound amounts of credit to one borrower or its affiliates;

i. failing to obtain and evaluate information demonstrating the feasibility and marketability of acquisition, development, and construction projects to ensure that they were likely to result in a repayment of the loan upon project completion;

j. failing to ensure that the Loan Transactions did not violate applicable banking laws and regulations;

k. failing to ensure proper loss recognition on the loans and that new loans were not made to delay recognition on prior loans, including by providing for interest payments;

l. failing to ensure that the Loan Transactions did not create unsafe and unsound concentrations of credit;

m. failing to properly monitor the performance of loans to minimize the risk of loss; and

n. ignoring warnings by the FDIC, IDFPR, and others, such as the Bank's compliance officer and outside auditor, about the Bank's lending operations.

Defendants knew or should have known that recommending and approving the Loan Transactions in those circumstances was extraordinarily risky. But they recommended and approved the Loan Transactions nevertheless. This was very great or gross negligence.

146.     As a direct and proximate result of Defendants' gross negligence, the FDIC-R suffered damages exceeding $9.14 million.

**COUNT II**
**BREACH OF FIDUCIARY DUTY CLAIMS AGAINST**
**DEFENDANTS PROSSER, SHINER, ECK, LURI, AND SEGVICH**

147.     The FDIC-R realleges and incorporates into this paragraph by reference each of the allegations in paragraphs 1 through 138 as though fully stated in this paragraph.

148.     Defendants Prosser, Shiner, Eck, Luri, and Segvich as directors were fiduciaries of the Bank.

149.     Defendants Prosser, Shiner, Eck, Luri, and Segvich as fiduciaries of the Bank had a duty to use reasonable care, skill, and diligence concerning the eight Loan Transactions including, without limitation, by:

a. complying with the Loan Policy and ensuring that the loans they approved complied with the Loan Policy;

b. conducting proper due diligence on each proposed loan and informing themselves about the risks the loan posed before approving it;

c.  ensuring that the loans they approved were underwritten in a safe and sound manner and that appropriate and current financial documentation was required and provided;

d.  ensuring that the loans they approved had reasonably reliable and adequate sources of repayment identified;

e.  ensuring that the loans they approved were to creditworthy borrowers;

f.  ensuring that the loans they approved were secured by sufficiently valuable collateral and backed by effective payment guaranties to prevent or minimize the risk of loss;

g.  ensuring that safe and sound loan to value ratio limits were followed;

h.  ensuring that the loans they approved did not result in the extension of excessively large, unsafe, or unsound amounts of credit to one borrower or its affiliates;

i.  obtaining and evaluating information that demonstrated the feasibility and marketability of acquisition, development, and construction projects to ensure that they were likely to result in a repayment of the loan upon project completion;

j.  ensuring that the loans they approved did not violate applicable banking laws and regulations;

k.  ensuring proper loss recognition on the loans and that new loans were not made to delay loss recognition on prior loans;

l.  ensuring that the loans they approved did not create unsafe and unsound concentrations of credit;

m.  properly monitoring the performance of loans to minimize the risk of loss; and

n.  heeding warnings by the FDIC, IDFPR, and others, such as the Bank's compliance officer and outside auditor, about the Bank's lending operations.

150.    Given the warnings by the FDIC, IDFPR and others, such as the Bank's compliance officer and outside auditor, and their knowledge of the declining or at least impaired Chicago real estate market, Defendants Prosser, Shiner, Eck, Luri, and Segvich had heightened duties.

151.    Defendants Prosser, Shiner, Eck, Luri, and Segvich in causing the Loan Transactions to be approved breached their fiduciary duties by, among other things:

a.  disregarding the Loan Policy in approving the eight Loan Transactions on terms that violated the Loan Policy;

b.  failing to conduct proper due diligence on each of the Loan Transactions and failing to inform themselves about the risks the loans posed before approving them;

c.  failing to ensure that the Loan Transactions were underwritten in a safe and sound manner and that appropriate and current financial documentation was required and provided;

d.  failing to ensure that the Loan Transactions had reasonably reliable and adequate sources of repayment identified;

e.  approving the Loan Transactions for un-creditworthy borrowers;

f.  failing to ensure that the Loan Transactions were secured by sufficiently valuable collateral and guaranties to prevent or minimize the risk of loss;

g.  failing to ensure that safe and sound loan to value ratio limits were followed;

h.  failing to ensure that the loans they approved did not result in the extension of excessively large, unsafe, or unsound amounts of credit to one borrower or its affiliates;

i.  failing to obtain and evaluate information demonstrating the feasibility and marketability of acquisition, development, and construction projects to ensure that they were likely to result in a repayment of the loan upon project completion;

j.  failing to ensure that the Loan Transactions did not violate applicable banking laws and regulations;

k.  failing to ensure proper loss recognition on the loans and that new loans were not made to delay loss recognition on prior loans, including by providing for interest payments;

l.  failing to ensure that the Loan Transactions did not create unsafe and unsound concentrations of credit;

m.  failing to properly monitor the performance of loans to minimize the risk of loss; and

n.  ignoring warnings by the FDIC, IDFPR, and others, such as the Bank's compliance officer and outside auditor, about the Bank's lending operations.

152.  Defendants Prosser, Shiner, Eck, Luri, and Segvich may not rely on the business judgment rule. None of the wrongful acts or omissions by them alleged in this Count was in good faith or occurred after they became reasonably well-informed.

153.    As a direct and proximate result of the breaches of fiduciary duties by Defendants Prosser, Shiner, Eck, Luri, and Segvich, the FDIC-R suffered damages exceeding $9.14 million.

## COUNT III
## NEGLIGENCE CLAIMS AGAINST
## DEFENDANTS THORSEN, HUBBARD, AND FRIEDMAN

154.    The FDIC-R realleges and incorporates into this paragraph by reference each of the allegations in paragraphs 1 through 138 as though fully stated in this paragraph.

155.    Defendants Thorsen, Hubbard, and Friedman were officers of the Bank.

156.    Defendants Thorsen, Hubbard, and Friedman as Bank officers had a duty to use reasonable care, skill, and diligence concerning the eight Loan Transactions including, without limitation, by:

a.   complying with the Loan Policy and ensuring that the loans they recommended or approved complied with the Loan Policy;

b.   conducting proper due diligence on each proposed loan and informing themselves about the risks the loan posed before recommending or approving it;

c.   ensuring that the loans they recommended or approved were underwritten in a safe and sound manner and that appropriate and current financial documentation was required and provided;

d.   ensuring that the loans they recommended or approved had reasonably reliable and adequate sources of repayment identified;

e.   ensuring that the loans they recommended or approved were to creditworthy borrowers;

f. ensuring that the loans they recommended or approved were secured by sufficiently valuable collateral and backed by effective payment guaranties to prevent or minimize the risk of loss;

g. ensuring that safe and sound loan to value ratio limits were followed;

h. ensuring that the loans they recommended or approved did not result in the extension of excessively large, unsafe, or unsound amounts of credit to one borrower or its affiliates;

i. obtaining and evaluating information that demonstrated the feasibility and marketability of acquisition, development, and construction projects to ensure that they were likely to result in a repayment of the loan upon project completion;

j. ensuring that the loans they recommended or approved did not violate applicable banking laws and regulations;

k. ensuring proper loss recognition on the loans and that new loans were not made to delay loss recognition on prior loans;

l. ensuring that the loans they recommended or approved did not create unsafe and unsound concentrations of credit;

m. properly monitoring the performance of loans to minimize the risk of loss; and

n. heeding warnings by the FDIC, IDFPR, and others, such as the Bank's compliance officer and outside auditor, about the Bank's lending operations.

157.    Given the warnings by the FDIC, IDFPR and others, such as the Bank's compliance officer and outside auditor, and their knowledge of the declining or at least impaired Chicago real estate market, Defendants Thorsen, Hubbard, and Friedman had heightened duties.

158.    Defendants Thorsen, Hubbard, and Friedman in causing the Loan Transactions to be approved breached their duties and were negligent by, among other things:

a.  disregarding the Loan Policy in recommending or approving the eight Loan Transactions on terms that violated the Loan Policy;

b.  failing to conduct proper due diligence on each of the Loan Transactions and failing to inform themselves about the risks the loans posed before recommending or approving them;

c.  failing to ensure that the Loan Transactions were underwritten in a safe and sound manner and that appropriate and current financial documentation was required and provided;

d.  failing to ensure that the Loan Transactions had reasonably reliable and adequate sources of repayment identified;

e.  recommending or approving the Loan Transactions for un-creditworthy borrowers;

f.  failing to ensure that the Loan Transactions were secured by sufficiently valuable collateral and guarantees to prevent or minimize the risk of loss;

g.  failing to ensure that safe and sound loan to value ratio limits were followed;

h.  failing to ensure that the loans they recommended or approved did not result in the extension of excessively large, unsafe, or unsound amounts of credit to one borrower or its affiliates;

i.   failing to obtain and evaluate information demonstrating the feasibility and marketability of acquisition, development, and construction projects to ensure that they were likely to result in a repayment of the loan upon project completion;

j.   failing to ensure that the Loan Transactions did not violate applicable banking laws and regulations;

k.   failing to ensure proper loss recognition on the loans and that new loans were not made to delay loss recognition on prior loans, including by providing for interest payments;

l.   failing to ensure that the Loan Transactions did not create unsafe and unsound concentrations of credit;

m.  failing to properly monitor the performance of loans to minimize the risk of loss; and

n.  ignoring warnings by the FDIC, IDFPR, and others, such as the Bank's compliance officer and outside auditor, about the Bank's lending operations.

159.   Defendants Thorsen, Hubbard, and Friedman may not rely on the business judgment rule. None of the wrongful acts or omissions by them alleged in this Count was in good faith or occurred after they became reasonably well-informed.

160.   As a direct and proximate result of the negligence of Defendants Thorsen, Hubbard, and Friedman, the FDIC-R suffered damages exceeding $9.14 million.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY CLAIMS AGAINST**
**DEFENDANTS THORSEN, HUBBARD, AND FRIEDMAN**
**(In the alternative to Count III)**

161.     The FDIC-R realleges and incorporates into this paragraph by reference each of

the allegations in paragraphs 1 through 138 as though fully stated in this paragraph.

162.     The allegations of breach of fiduciary duties in this Count IV are stated in the

alternative to the allegations of negligence in Count III.

163.     Defendants Thorsen and Hubbard as Bank directors and officers and Defendant

Friedman as a Bank officer were fiduciaries of the Bank.

164.     Defendants Thorsen, Hubbard, and Friedman had fiduciary duties to use

reasonable care, skill, and diligence concerning the eight Loan Transactions including, without

limitation, by:

      a.   complying with the Loan Policy and ensuring that the loans they

         recommended or approved complied with the Loan Policy;

      b.   conducting proper due diligence on each proposed loan and informing

         themselves about the risks the loan posed before recommending or approving

         it;

      c.   ensuring that the loans they recommended or approved were underwritten in

         a safe and sound manner and that appropriate and current financial

         documentation was required and provided;

      d.   ensuring that the loans they recommended or approved had reasonably

         reliable and adequate sources of repayment identified;

      e.   ensuring that the loans they recommended or approved were to creditworthy

         borrowers;

f.   ensuring that the loans they recommended or approved were secured by
     sufficiently valuable collateral and backed by effective payment guaranties to
     prevent or minimize the risk of loss;

g.   ensuring that safe and sound loan to value ratio limits were followed;

h.   ensuring that the loans they recommended or approved did not result in the
     extension of excessively large, unsafe, or unsound amounts of credit to one
     borrower or its affiliates;

i.   obtaining and evaluating information that demonstrated the feasibility and
     marketability of acquisition, development, and construction projects to
     ensure that they were likely to result in a repayment of the loan upon project
     completion;

j.   ensuring that the loans they recommended or approved did not violate
     applicable banking laws and regulations;

k.   ensuring proper loss recognition on the loans and that new loans were not
     made to delay loss recognition on prior loans;

l.   ensuring that the loans they recommended or approved did not create unsafe
     and unsound concentrations of credit;

m.   properly monitoring the performance of loans to minimize the risk of loss;
     and

n.   heeding warnings by the FDIC, IDFPR, and others, such as the Bank's
     compliance officer and outside auditor, about the Bank's lending operations.

165.    Given the warnings by the FDIC, IDFPR and others, such as the Bank's compliance officer and outside auditor, and their knowledge of the declining or at least impaired Chicago real estate market, Defendants Thorsen, Hubbard, and Friedman had heightened duties.

166.    Defendants Thorsen, Hubbard, and Friedman in causing the Loan Transactions to be approved breached their fiduciary duties by, among other things:

      a.   disregarding the Loan Policy in recommending or approving the eight Loan Transactions on terms that violated the Loan Policy;

      b.   failing to conduct proper due diligence on each of the Loan Transactions and failing to inform themselves about the risks the loans posed before recommending or approving them;

      c.   failing to ensure that the Loan Transactions were underwritten in a safe and sound manner and that appropriate and current financial documentation was required and provided;

      d.   failing to ensure that the Loan Transactions had reasonably reliable and adequate sources of repayment identified;

      e.   recommending or approving the Loan Transactions for un-creditworthy borrowers;

      f.   failing to ensure that the Loan Transactions were secured by sufficiently valuable collateral and guaranties to prevent or minimize the risk of loss;

      g.   failing to ensure that safe and sound loan to value ratio limits were followed;

      h.   failing to ensure that the loans they recommended or approved did not result in the extension of excessively large, unsafe, or unsound amounts of credit to one borrower or its affiliates;

      i.   failing to obtain and evaluate information demonstrating the feasibility and marketability of acquisition, development, and construction projects to ensure that they were likely to result in a repayment of the loan upon project completion;

      j.   failing to ensure that the Loan Transactions did not violate applicable banking laws and regulations;

      k.   failing to ensure proper loss recognition on the loans and that new loans were not made to delay loss recognition on prior loans, including by providing for interest payments;

      l.   failing to ensure that the Loan Transactions did not create unsafe and unsound concentrations of credit;

      m.  failing to properly monitor the performance of loans to minimize the risk of loss; and

      n.  ignoring warnings by the FDIC, IDFPR, and others, such as the Bank's compliance officer and outside auditor, about the Bank's lending operations.

167.    Defendants Thorsen, Hubbard, and Friedman may not rely on the business judgment rule. None of the wrongful acts or omissions by them alleged in this Count was in good faith or occurred after they became reasonably well-informed.

168.    As a direct and proximate result of the breaches of fiduciary duties by Defendants Thorsen, Hubbard, and Friedman, the FDIC-R suffered damages exceeding $9.14 million.

## PRAYER FOR RELIEF

WHEREFORE, the FDIC-R asks this Court to grant the following relief:

A.  As to Counts I-IV, entry of a judgment for the FDIC-R for damages exceeding

$9.14 million, plus costs and interest; and

B.  For such other and further relief as this Court deems proper.

## JURY DEMAND

THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR

RAVENSWOOD BANK REQUESTS A TRIAL BY JURY ON ALL ISSUES TRIABLE OF

RIGHT BY JURY.

Dated: August 2, 2013                Respectfully submitted:

**FEDERAL DEPOSIT INSURANCE
CORPORATION as Receiver for
Ravenswood Bank**

 /s/ Christopher J. Graham
One of Its Attorneys

Christopher J. Graham, Bar No. 6185643
Dawn C. Wrona Eby, Bar No. 6210472
Joseph P. Kelly, Bar No. 6283224
**JONES LEMON & GRAHAM LLP**
328 S. Second Street
Geneva, IL 60134
Telephone: (630) 208-0805
Facsimile: (630) 208-4651
chrisg@joneslemon.com
dawne@joneslemon.com
jkelly@joneslemon.com